**Mark WESTOVER and Roxann Westover, Plaintiffs and Appellees,**

v.

**EAST RIVER ELECTRIC POWER COOPERATIVE, INC., Defendant and Appellant.**

**No. 17607.**

Supreme Court of South Dakota.

Argued April 21, 1992.

Decided July 1, 1992.

James E. McMahon and Terry N. Prendergast of Boyce, Murphy, McDowell & Greenfield, Sioux Falls, for plaintiffs and appellees.

William F. Day, Jr., and R. Alan Peterson of Lynn, Jackson, Shultz & Lebrun, Sioux Falls, for defendant and appellant.

GILBERTSON, Circuit Judge.

## INTRODUCTION

In this action, plaintiffs sought to recover from the defendant for personal injuries sustained by plaintiff, Mark Westover, and loss of consortium sustained by his wife, Roxann Westover. The defendant appeals from a unanimous jury verdict for the plaintiffs. We affirm.

## ISSUES PRESENTED

### I.

WAS THE PLAINTIFF, MARK WESTOVER, CONTRIBUTORIALLY NEGLIGENT MORE THAN SLIGHT AS A MATTER OF LAW?

### II.

DID THE PLAINTIFF, MARK WESTOVER, ASSUME THE RISK OF HIS INJURY AS A MATTER OF LAW?

## FACTS

The plaintiff[1] is a journeyman linemen who was injured on November 1, 1988, when he came into contact with a portion of an electrical substation during a de-energization procedure. De-energization is the cutting off of electrical power to the substation. As a result of these injuries, he lost both of his arms up to the elbow.

The plaintiff has been employed by Sioux Valley Empire Electric Association (Sioux Valley) since 1971. Through on the job training and correspondence courses, plaintiff was certified as a journeyman lineman on June 1, 1980. A journeyman lineman at Sioux Valley is expected to be able to perform the construction and maintenance work on Sioux Valley equipment. As Sioux Valley owns no electrical substations, plaintiff did not receive any training on them and prior to his accident, had very limited experience on substation de-energization work hereinafter described. He had participated in only one previous similar de-energizition of an electrical substation and that was many years prior to the accident.

The substations in the Sioux Valley territory are owned by defendant East River Electric Power Cooperative, Inc. (East River).[2] By letter of April 4, 1988, East River notified Sioux Valley that the Garretson substation would have to be moved to replace its cement pilings. Sioux Valley's involvement was requested because it owned the disconnect switches, bypass switches and oil circuit reclosers (OCRs) which were used at the substation.[3] This project required the installation of a portable substation during this work so that service was not interrupted to Sioux Valley customers.

It was agreed that this work would be commenced on November 1, 1988. East River foreman, Richard Olson, arrived at the Garretson substation on October 31, 1988. He had conversations with Sioux Valley employees on that day but no specifics of the next day's work were discussed.

East River's Safety and Procedure Manual (hereinafter manual) contained a proce-

1. Although both Mark Westover and Roxann Westover prevailed as plaintiffs, Roxann Westover's claim was for loss of consortium. She was not present at the site of the injury and hereafter all references to the "plaintiff" are to Mark Westover.

2. East River is an electrical cooperative which obtains power from the supplier and distributes it to its 26 member cooperative systems in eastern South Dakota. It is the sole supplier to these member systems. One of these member systems is Sioux Valley. Thus, Sioux Valley is

both a part owner of East River and also a customer.

As part of its distribution system, East River owns 185 substations which reduce the voltage so that it can be supplied to consumers. East River also employs substation crews which have special training in this area.

3. A picture of the Garretson substation is attached to this opinion. It identifies the OCR's, the disconnect switches and the by-pass switches which figure prominently in this case.

dure for de-energizing a substation. Olson testified that he did not consult this manual prior to work on this project. He admitted that there probably was a copy of the manual in the glove box of his truck which he drove to the project.

The East River manual required a written switching order program for de-energizing a substation. This pre-printed document lists the necessary steps in a checklist format to complete the project. One purpose of this order is that it acts as a safety device so that no necessary steps are inadvertently omitted which could lead to an accident. No written switching order was ever prepared for this project. East River officials argue that it was not needed as this was a simple project in which all trained personnel knew what to do and there were frequent discussions as needed at the work site.

East River's manual also required that its radio dispatcher be furnished with a copy of the switching order. According to the manual, the dispatcher is in charge and must give his approval before any step can be undertaken. As the lineman on the scene completes a step in the process, he not only checks that off on his switching order, he informs the dispatcher by radio who also notes this work on the dispatcher's copy. In part, this acts as a backup safety device to see all required steps are completed in proper order. Not only was there no switching order, there was no radio contact with the dispatcher while the work was done at the substation prior to the plaintiff's injury.

The Sioux Valley line crew arrived at the Garretson site on November 1, 1988. They were to disconnect the "low side" of the substation while the East River personnel dealt with the "high side." [4] Like the plaintiff, the balance of the Sioux Valley crew at the site did not possess much experience with this type of substation de-energization work. Both Robert Austin and

Marv Jastram, who were the foremen in charge of the Sioux Valley crew at various times on that day, testified they viewed East River's Olson as in charge of the entire operation and more specifically the safe coordination of the work.

The portable substation was hooked up to the Garretson substation. East River's Olson instructed that the switch on the north OCR of the Garretson substation be opened. Under normal conditions this would have cut off all power to that substation and de-energized it. However, in this instance, the portable substation continued to backfeed power into the Garretson substation. Although the plaintiff did have some experience working on OCR maintenance, it was after the OCR was de-energized. The unusual factor for him on the day he was injured, was that the OCR on the Garretson substation continued to be energized after that substation was shut down because of the backfeeding from the portable substation.

Next, Olson instructed the Sioux Valley crew to remove wires called "jumpers" which connected the Garretson substation to the distribution lines. Marv Jastram of Sioux Valley went up in a bucket truck to disconnect these "jumpers." If this removal would have been completed, the substation would have been entirely de-energized. Jastram had disconnected one jumper and it would have taken approximately thirty seconds to disconnect the other two.

At this point, the plaintiff looked up at switches which were located above the OCR. There are two sets of switches, the by-pass switches and the disconnect switches. Until Jastram completed the removal of the jumpers, the OCR would remain energized unless the disconnect switches above the OCR were opened. The open by-pass switches, which were located directly above the closed disconnect switches, allowed power to pass into the OCR.[5] Plaintiff decided to attempt the re-

---

4. Power is provided to the substation by East River in an amount of 69,000 volts (the high side). The power is routed through the substation and is reduced to 7,200 volts (the low side) for further transmission.

5. As previously noted, East River had a safety manual which contained a detailed procedure for de-energization of the substation. Had it been followed, step number three, which required the opening of all (low side) disconnect

moval of the jumper wires from the OCR bushings.

Plaintiff apparently looked up at the by-pass switches and mistakenly assumed that he was looking at the disconnect switches. From the open switches he saw, he assumed them to be open disconnect switches and therefore he erroneously believed the power coming into the Garretson substation from the portable substation had been cut off to the OCR.[6] In reality he was looking at open by-pass switches which allowed power to go into the OCR.

Plaintiff climbed up on the OCR without the use of rubber gloves or a "hot stick" which are safety devices for working on energized equipment. He felt such equipment was unnecessary as at that point, he had visually satisfied himself that the OCR was completely de-energized. He testified that Sioux Valley only required the use of safety equipment, such as rubber gloves and hot sticks, on energized equipment. In prior work on that day on energized equipment, plaintiff had worked with both gloves and hot sticks.

At this point he came into contact with an OCR bushing, which was still energized from the 7200 volts backfeeding from the portable substation through the closed disconnect switches. Plaintiff was electrocuted. As a result of this incident he lost both of his arms to the elbow.[7]

## LEGAL ANALYSIS
## STANDARD OF REVIEW

The defendant sought a directed verdict and later, to overturn the jury's verdict by a motion for judgment notwithstanding the verdict. Both were denied by the circuit court. Our standard of review of the circuit court's denial of a directed verdict and of the jury's determination in favor of this plaintiff is well established. We must examine the evidence in the light most favorable to the non-moving party and give him the benefit of all reasonable inferences. *Robinson v. Mudlin*, 273 N.W.2d 753, 755 (S.D.1979). The moving party is entitled to evidentiary consideration only where its evidence is uncontradicted or tends to amplify, clarify or explain the evidence in support of the verdict of the jury for the prevailing party. *Nugent v. Quam*, 82 S.D. 583, 152 N.W.2d 371, 374 (1967).

In such a context, it becomes our task to review the record and determine whether there is any substantial evidence to allow reasonable minds to differ. *Haggar v. Olfert*, 387 N.W.2d 45 (S.D.1985). This court does not weigh the evidence and substitute its judgment for that of the jury. *Robinson v. Mudlin, supra; Berg v. Sukup Mfg.*, 355 N.W.2d 833, 835 (S.D.1984). The decision of the jury is likely to be upheld as questions of negligence, contributory negligence and assumption of the risk are for the determination by the jury "in all except the rarest of instances." *Stoltz v. Stonecypher*, 336 N.W.2d 654, 657 (S.D.1983). *See also Myers v. Lennox Co-op Ass'n*, 307 N.W.2d 863, 864 (S.D.1981).

It is only when the facts show beyond any dispute that plaintiff has committed negligence more than "slight," that it is appropriate for the circuit court and this court to hold, as a matter of law, for a negligent defendant. *Starnes v. Stofferahn*, 83 S.D. 424, 160 N.W.2d 421, 426

switches would have been accomplished. Both Olson and Assistant General Manager of East River, Everett Quam, testified that had these disconnect switches been opened in accordance with East River's manual, the OCR bushings would have been de-energized when plaintiff came into contact with them and thus, the accident would never have happened.

6. East River's manual also required that whenever an East River lineman received permission from the East River dispatcher to open a switch that had been closed, such as a disconnect switch, it was to be marked by a bright colored

"hold tag." This was to call to the workmen's attention that the switch was now open by order and to prevent workmen from closing the switch until the proper order was given to close by the dispatcher. Despite this requirement, no hold tags were used on this project.

7. East River does not appeal the amount of the jury award of $2,599,200 to Mark Westover and $1,000,000 to his wife, Roxann Westover. Therefore, it is not necessary to detail the extent of their loss.

(S.D.1968). In the absence of a factual dispute, where the evidence warrants, the circuit court and this court can find assumption of the risk as a matter of law. *Lovell v. Oahe Elec. Coop,* 382 N.W.2d 396, 400 (S.D.1986); *Jackson v. Van Buskirk,* 424 N.W.2d 148 (S.D.1988); *Musilek v. Stober,* 434 N.W.2d 765 (S.D.1989).[8] Such a finding by the trial court precludes the plaintiff from a recovery. *Howard v. Sanborn,* 483 N.W.2d 796, 798 (S.D.1992).

## ISSUE I

WAS THE PLAINTIFF, MARK WESTOVER, CONTRIBUTORIALLY NEGLIGENT[9] MORE THAN SLIGHT AS A MATTER OF LAW?

1. *The Elements of Comparative Negligence.*

■ Under South Dakota's comparative negligence statute, SDCL 20-9-2[10], a plaintiff may recover if his negligence was slight in comparison with the negligence of the defendant. *Lovell, supra,* at 399. The question of a plaintiff's contributory negligence is a two-step inquiry. *Nugent, supra.*

The first step of the *Nugent* analysis is a determination of whether the plaintiff and the defendant were negligent. If either is found to be not guilty of negligence, "there can be no application of the comparative negligence law." *Nugent, supra,* at 377. In making such a determination, the expected standard of conduct, that being a reasonable[11] and prudent person, is the basis to determine if either or both the plaintiff and defendant fell below that required level of behavior. *Lovell, supra,* at 399 citing *Nugent* at 377; *Musilek, supra.* "The greater the danger, the greater the care required so that a very high degree of danger calls for a very high degree of care which, however, amounts to ordinary care in view of the situation and circumstances." *Nugent, supra,* at 378 citing *Bucholz v. City of Sioux Falls,* 77 S.D. 322, 91 N.W.2d 606, 612 (S.D.1958). *See also Lovell, supra,* at 398.

If both are found to be negligent, the second step of the process requires that the negligence of the plaintiff must be compared to the negligence of the defendant. If it is determined that a plaintiff has committed negligence more than slight, the plaintiff cannot recover. *Nugent, supra.* In making such a determination there is a direct comparison between the conduct of the plaintiff and the defendant rather than to the standard of the reasonable person. *Nugent, supra; Musilek, supra.*

■ In application of the facts of this case to the first factor, the plaintiff must concede that he was negligent in making his visual inspection of the substation to see if the disconnect switches were open. He visually saw an open switch but he failed to make an exacting enough inspection to determine that he was viewing the by-pass switches rather than the disconnect switches. Plaintiff testified at trial that he

---

**8.** *Lovell, Jackson* and *Musilek* were decided by a divided court. However, the disagreement was not as to the appropriate standard of review but rather on the application of the particular facts of those cases to the settled law concerning negligence, contributory negligence and assumption of the risk.

**9.** Contributory negligence is conduct for which plaintiff is responsible, amounting to a breach of duty which the law imposes upon persons to protect themselves from injury, and which, concurring and cooperating with actionable negligence for which defendant is responsible, contributed to the injury complained of as a proximate cause.
*Howard, supra,* at 797 *citing Zee v. Assam,* 336 N.W.2d 162, 164 (S.D.1983).

**10.** SDCL 20–9–2 provides:

In all actions brought to recover damages for injuries to a person or to his property caused by the negligence of another, the fact that the plaintiff may have been guilty of contributory negligence shall not bar a recovery when the contributory negligence of the plaintiff was slight in comparison with the negligence of the defendant, but in such case, the damages shall be reduced in proportion to the amount of plaintiff's contributory negligence.

**11.** The words "reasonable man" denote a person exercising those qualities of attention, knowledge, intelligence and judgment which society requires of its own members for the protection of their own interests and the interests of others. *Nugent, supra,* at 377, citing Restatement of the Law, Torts, § 283, "comments."

was aware of the difference. Likewise, plaintiff's expert witness testified candidly on this point that plaintiff made a "mistake." A plaintiff cannot claim a version of facts more favorable to his position than he gave in his own testimony. *Lalley v. Safway Steel Scaffolds, Inc.*, 364 N.W.2d 139, 141 (S.D.1985).

The standard of conduct to which East River is held is well settled by this court:

> The distribution of electrical energy is a highly dangerous activity and anyone doing so is under a duty to exercise ordinary and reasonable care under all the circumstances to prevent injury to persons and property. This requires care commensurate with the danger involved consistent with the practical operation of the business.

*Ward v. LaCreek Electric Association*, 83 S.D. 584, 163 N.W.2d 344, 347 (S.D.1968).

The negligence of East River was established by the jury. As East River has not appealed this determination, it is not properly before us for review and is accepted as fact.

The second part of the *Nugent* test then calls for a comparison to measure the negligence of this plaintiff against the negligence of this defendant to determine if the plaintiff's negligence is more than "slight." In discussing the scope of the term "slight," we have stated:

> It is now a relative and variable term which defies precise definition and prohibits an arbitrary mathematical ratio limitation. Broadly speaking, our comparative negligence act now applies whenever a plaintiff's contributory negligence is determined to be small in comparison with defendant's negligence. What constitutes "slight" or "small" contributory negligence naturally varies with the facts and circumstances in each case. The same conduct constituting slight or small contributory negligence in one case may be great in others when compared with the negligent acts of different defendants under different facts and circumstances.

*Crabb v. Wade*, 84 S.D. 93, 167 N.W.2d 546, 549 (S.D.1969). *See also Corey v.*

*Kocer*, 86 S.D. 221, 193 N.W.2d 589, 596 (S.D.1972); *Urban v. Wait's Supermarket, Inc.*, 294 N.W.2d 793, 796 (S.D.1980).

2. *The Extent of the Negligence of the Plaintiff, Mark Westover.*

As an aid to analyze the extent of a plaintiff's negligence, the Eighth Circuit Court of Appeals offered a three part test in *Associated Engineers v. Job*, 370 F.2d 633, 641 (8th Cir.1966) *cert. denied* 389 U.S. 823, 88 S.Ct. 59, 19 L.Ed.2d 77 (1967). Judge (later Justice) Blackmun arrived at these three factors after an in depth examination of South Dakota case law on the subject, *Associated Engineers v. Job*, 370 F.2d at 641:

> Three factors may properly be considered in appraising the quality of a plaintiff's negligence: the precautions he took for his own safety; the extent to which he should have comprehended the risk as a result of warnings, experience, or other factors, and the foreseeability of injury as a consequence of his conduct. These factors of course may overlap in a given case, for a plaintiff may increase the foreseeability of injury by failing to take safety precautions and greater precautions may be expected if he is aware of danger.

We subsequently cited these factors with approval in *Lovell, supra.* Both plaintiff and East River sought to show that the analysis contained in the *Job* factors, was in accord with their opposing views as to the extent of the plaintiff's contributory negligence.

Plaintiff did take several steps for his own safety. He listened for the shutdown of the substation transformer and waited for the switch of the north OCR to be opened. Under normal circumstances with which he had experience, this would have de-energized the OCR. He was also trained to visibly look to see if the switches were open. This he did, albeit, he looked at the wrong switches.

East River argues that the plaintiff should have been wearing the available rubber gloves and tested the OCR before attempting to work on it. This is the same

argument East River unsuccessfully advanced to the jury at trial. Experts testifying for both sides at trial recognized that visible inspection was an optional alternative to the use of safety equipment. In fact, the plaintiff had only been trained by Sioux Valley to use the visual check method on de-energized equipment. The safety equipment was for use on equipment known to be energized. With inferences to be decided in favor of the prevailing party, it appears that he took precautions for his own safety.

The second *Job* factor is a consideration of the risk as a result of the warnings, experience and other factors. On the day of the accident, eighteen trained personnel from East River and Sioux Valley were working on the substation project besides the plaintiff. Plaintiff may have even borrowed a tool from a co-worker before he began his ascent up the substation. Yet, not one person there recognized the danger to the point of shouting a warning to the plaintiff. It is clear that some of the personnel there were watching Marv Jastram at that time and the rest claim not to have seen the plaintiff make his ill-fated climb. However, this points out that no one there took overall responsibility for supervision of the project and the safety of those involved.[12]

The plaintiff had only worked on de-energizing a substation on one prior occasion. In fact, all of the Sioux Valley crew, although experienced at repairing de-energized OCR's, had little prior work time on this type of project which involved back-

feeding power from the portable substation into the Garretson substation.[13]

The final *Job* criteria is the foreseeability of injury as a consequence of the plaintiff's conduct. In this case, this factor is readily answered by the previous two. Based on his previous training and experience, there was an evidentiary basis for the jury to find plaintiff's conduct did not increase the foreseeability of the accident to more than slight.

Defendant's analysis of plaintiff's conduct arrives at a different interpretation than that of the jury. It finds his contributory negligence to be well above the "slight" standard. However, the fundamental flaw in its argument is that it fails to compare its own conduct against that of the plaintiff. *Norwest Capital Management & Trust Co. v. U.S.*, 828 F.2d 1330, 1336 (8th Cir.1987). Such a comparison is the basis upon which SDCL 20-9-2, and interpretative case law such as *Nugent*, rely in making a determination as to whether plaintiff's negligence is more than slight.

### 3. The Extent of the Negligence of the Defendant, East River.

East River has cited to this court numerous case authority from other jurisdictions that have held plaintiffs who have been injured by utility lines, to have been contributorially negligent as a matter of law. However, these cases generally have found the utility to be without fault or the conduct of the utility is easily distinguishable on the facts. The utility being found to be

---

**12.** Throughout the trial, East River strenuously argued to the jury that East River was only responsible for its own personnel and its work on the "high side" of the substation. It claimed that Sioux Valley was exclusively responsible for its crew, which included the plaintiff, and the work on the "low side" of the substation. The jury determined otherwise. As the issue of control was not appealed, it is not before us for review and is decided in favor of the plaintiff.

**13.** Plaintiff was not alone in his confusion as to the status of the by-pass switches versus the disconnect switches when power was backfed into the substation.

Marv Jastram, the Sioux Valley foreman, called the entire assembly a by-pass switch. Greg Bur-

rell, another Sioux Valley lineman present that day, thought the open by-pass switch cut the power to the OCR.

East River misidentified the disconnect switches as the by-pass switches in a picture book it prepared after the accident.

Even Frank Denbrok, one of East River's experts, was confused to the point he thought the by-pass switches were closed at the time of plaintiff's injury. Denbrok testified at a deposition that if the by-pass switches had been open at the time of plaintiff's contact with the OCR, there would have been no injury. In reality, the by-pass switches were open at the time of the injury.

without fault is not the finding of the jury herein.[14]

Given the comparison standard mandated by SDCL 20-9-2 and interpretative case law, the use of the *Job* factors is also helpful in this case in analyzing the extent of East River's negligence.

The record contains numerous examples of East River's failure to assure the plaintiff a safe place to work despite East River's claimed expertise with what it described as a simple project. East River did not do the pre-job planning concerning the details of the project with Sioux Valley as required by East River's manual. East River failed to draft and use a written switching order which would have listed the necessary steps to safely complete the project. East River failed to obtain permission from its radio dispatcher prior to the completion of each step. Had it done so, the dispatcher would have been in a position to inform the crew at the scene that the disconnect switches had not been opened. East River personnel on the scene, failed to follow all the steps for de-energization of the substation listed in its manual, more specifically opening the disconnect switches. East River did not have one person present to coordinate the entire project as required by the manual. Its foreman Olson, testified that he felt that the Sioux Valley personnel were to complete their portion of the project independent of supervision from East River.

East River's failure to follow its own safety procedures, coupled with the apparent lack of supervision and warnings which would inform the plaintiff of the danger, give the jury a factual justification for finding plaintiff's injury was a foreseeable result mainly because of East River's conduct.

Thus, an examination of the evidence in a light most favorable to the plaintiff and giving him the benefit of all reasonable inferences does not convince us that the circuit court erred in refusing to grant a directed verdict or a judgment NOV in favor of East River as a matter of law on the basis of plaintiff's contributory negligence.

## ISSUE II

### DID THE PLAINTIFF, MARK WESTOVER, ASSUME THE RISK OF HIS INJURY AS A MATTER OF LAW?

■ The test to determine the existence of assumption of the risk is as follows:

1. Did the plaintiff have actual or constructive knowledge of the risk;

2. Did the plaintiff have an appreciation of the risk's character; and

3. Did the plaintiff have a voluntary acceptance of the risk, having had the time, knowledge, and experience to make an intelligent choice.

*Ballard v. Happy Jack's Supper Club*, 425 N.W.2d 385, 389 (S.D.1988).[15]

14. East River's reliance on our decision in *Jackson v. Van Buskirk*, 424 N.W.2d 148 (S.D.1988) is misplaced. That case held that a servant may not recover from his master for injuries he sustained where the master had furnished a suitable place to work or in the alternative, where the master did not furnish a safe place to work but the danger was obvious. Herein the jury had an evidentiary basis to find that East River had not furnished a safe place to work and that the danger was not obvious (see footnote 13).

15. The plaintiff urges this court to reject its current objective criteria concerning assumption of the risk and in its place adopt a subjective standard as is advocated by Prosser and Keaton in their book on torts:

This is the idea the courts are attempting to convey when they state the doctrine in terms of what the plaintiff "knew or should have

known" about the danger. But to formulate the rule in such terms is calculated at best to confuse the jury, and it is usually seriously misleading, since the apparent question put by such a standard is whether the plaintiff ought to have perceived the danger—by some external objective standard of proper behavior—rather than the subjective question of whether the plaintiff himself actually knew the risk was present. But this is plainly wrong, and the use of "should have known" language in such instructions to the jury should therefore be prohibited. What the courts have been searching for is some way to let the jurors know that they do not have to take the plaintiff at his word, but that they may instead test his protestations of ignorance of the risk by some external standard based on ordinary principles of credibility and common sense. It would be much better if the courts would simply say so.

There is no evidence that plaintiff came into contact with the OCR bushing actually knowing it was energized. During cross-examination, the plaintiff was questioned no less than five times concerning his opinion, immediately prior to his injury, as to whether the OCR and its bushings were still energized. Plaintiff responded to all five inquiries that at that point, he believed the disconnect switches to be open and therefore, the OCR and its bushings were de-energized.

Thus, the consideration becomes whether he can be charged with constructive notice of this fact. One has constructive knowledge of a risk if that risk is so plainly observable anyone of "competent faculties will be charged with knowledge of it." *Carlson v. Peterson,* 756 F.2d 72, 73 (8th Cir.1985) relying upon *Bartlett v. Gregg,* 77 S.D. 406, 92 N.W.2d 654, 657 (1958).

Plaintiff had actual knowledge of when the OCR would ordinarily de-energize during normal maintenance. However, as noted above, there is a factual basis which would allow a jury to find that he did not possess the same knowledge immediately prior to his injury when the portable substation back-fed power into the Garretson substation. Likewise, the jury could reasonably find the plaintiff did not have constructive knowledge based on his lack of experience in this situation especially considering the confusion of others involved in the project or who claim to have expertise in the area. (*See* footnote 13). Thus, those cases cited by East River in which plaintiffs were held to have constructive knowledge that power lines are generally charged are distinguishable on the facts.

In a like vein, the plaintiff argues the jury could have resolved the second factor in the plaintiff's favor based on the same evidence. East River counters that a party may have actual appreciation of a risk or a party can be deemed to appreciate a risk if it is the type of risk that no adult of average intelligence can deny. *Carlson,*

*supra,* at 73. Herein, there was an evidentiary basis for the jury to find otherwise and it chose to do so.

The third factor is whether the plaintiff voluntarily accepted the risk, having the time, knowledge and experience to make an intelligent choice. *See Thomas v. St. Mary's Roman Catholic Church,* 283 N.W.2d 254, 260 (S.D.1979); *Myers, supra,* at 864. Like the other two factors, there was sufficient evidence for the jury to find against East River on this point.

As assumption of the risk was an affirmative defense raised by East River, SDCL 15-6-8(c), failure to establish any one of the above three criteria would be fatal to this defense before the jury. *Job, supra,* at 639. Based on the state of the record we cannot say as a matter of law that the circuit court erred in failing to find plaintiff assumed the risk as a matter of law.

## CONCLUSION

The plaintiff argues that if the jury's verdict is overturned, it will mean utilities have immunity from suit where their employees, or those under their control, are injured. The defendant counters that if the jury's verdict is left intact, it will be a basis for making the utility akin to an insurer against any unfortunate result visited upon anyone.

We see this case as creating neither a hard nor fast rule. As with any other tort case, the facts are unique to this case. Any future case's reliance on this case, is limited by the recognition that the future cases will contain different facts to be weighed by a different fact finder appropriately instructed concerning our law of negligence, contributory negligence and assumption of the risk.

In its answer, the defendant raised the affirmative defenses of contributory negligence and assumption of the risk. It also demanded a jury trial. It got one. There is an evidentiary basis to affirm the jury's verdict.

---

Prosser and Keaton, *The Law or Torts,* § 68 (Fifth Ed.) (1988 supp. to p. 488).

In accordance with our present objective standard, the circuit court so instructed the jury. As the plaintiff has not filed a notice of review for

us to determine this issue, it is not properly before us and awaits another day for our consideration. SDCL 15-26A-22, *Rowett v. McFarland,* 394 N.W.2d 298, 308 (S.D.1986).

MILLER, C.J., and HENDERSON, SABERS and AMUNDSON, JJ., concur.

GILBERTSON, Circuit Judge, for WUEST, J., disqualified.