Cheryl BELL, Special Administrator
of the Estate of Randy Bell,
Plaintiff and Appellant,

v.

EAST RIVER ELECTRIC POWER CO-
OPERATIVE, INC., and City of Wess-
ington Springs, South Dakota, Defen-
dants and Appellees.

No. 18903.

Supreme Court of South Dakota.

Considered on Briefs May 24, 1995.

Decided July 26, 1995.

Rick Johnson of Johnson, Eklund, Nicholson, Dougherty & Abourezk, Gregory, for plaintiff and appellant.

William F. Day, Jr., R. Alan Peterson of Lynn, Jackson, Shultz & Lebrun, P.C., Sioux Falls, for defendants and appellees.

KONENKAMP, Justice.

A man constructing a metal building on his property was electrocuted when he came close to an overhead high power line. In its suit the Estate introduced a written agreement between the power company and the former property owner, a railroad, asserting the agreement made the power company legally responsible for the death. The trial judge declined to direct a verdict on liability and the jury ruled the deceased had assumed the risk. The Estate appeals and we affirm.

## FACTS

In March of 1959, East River Electric Power Cooperative, Inc. (East River) executed a Pole and Wire Agreement (Agreement) with the Chicago, Milwaukee, St. Paul and Pacific Railroad Company (Railroad) permitting East River to place poles and electrical transmission wires across the Railroad's property in Wessington Springs. The agreement stipulated the power lines would hang a minimum of 32 feet above the rail tops. East River agreed not to interfere with any improvements or facilities on the affected properties and to move its lines upon demand of the Railroad. East River further agreed to

> release, indemnify and save harmless the Railroad, its successors and assigns, from and against all loss, damages, claims, demands, actions, causes of action, costs and expenses of every character which may result from any injury to or death of any person whomsoever[.]

The land covered by the agreement was eventually sold. On October 8, 1987, when

Randy Bell acquired a portion of this property, no tracks ran beneath the power lines on his land.

In April 1991, Bell, an experienced carpenter, obtained a building permit from the City of Wessington Springs to construct a pole barn on his property. Under the plans he supplied to the city, the electrical lines would not cross over the proposed building. A building permit was issued, but an unplatted street which ran across Bell's property caused him to alter the direction and dimensions of the structure. Aware of this change, city employees assisted in a new survey of the property and moved a fire hydrant. The city electric superintendent used the city's pole digger to dig holes for the building directly beneath the power line. Though city officers were aware the pole barn would be built directly under East River's 34,500 volt transmission line, East River was never informed of the project. By September 4, 1991, the poles were set and the sides of the building were framed. Two months later, the tin sides and roof had been installed. The peak of the building stood 21'1/2" above ground. The power line crossed this point at 25'8" leaving a 4'7 1/2" clearance between the building's peak and the line. During construction, Bell and his crew repeatedly had to duck under and warn each other to be careful of the electrical line. As a part of routine maintenance, East River annually inspects its lines four times by air and one by ground. The December 1991 fly-over inspectors failed to notice the nearly completed pole barn beneath East River's transmission line.

On January 11, 1992, Bell was on the metal roof to install a ridge row on the peak. No one knows exactly what happened, as there were no witnesses, but at some point he was electrocuted. He never regained consciousness and died in a hospital eleven days later. Bell's wife, Cheryl, commenced suit on behalf of Bell's Estate against Wessington Springs and East River. The Estate's forensic expert concluded Bell was in a kneeling position working below the power line when electricity arced from the uninsulated line striking him in the head. Agreeing an arc could have occurred over a very short distance, East River's expert believed Bell's head touched the line or came within one-half inch

of it, because flesh and hair were found imbedded in the wire.

The Estate asserted the Agreement with the Railroad pledged East River would assume all liability for injuries and Bell as a successor to the Railroad was entitled to the Agreement's benefits. The trial court refused to accept this interpretation. The jury found both East River and Wessington Springs negligent and ruled such negligence was a proximate cause of Bell's injuries. The jury also determined, however, that Bell assumed the risk. Hence, no damages were awarded. Wessington Springs settled with the Estate, leaving open East River's indemnity claim against it. Bell's Estate seeks reversal against East River on the following issues:

I. Did the trial court err in refusing to allow Bell the benefit of the terms of the Pole and Wire Agreement?

II. Did the trial court err by instructing the jury on assumption of the risk?

III. Did the trial court err by instructing the jury on South Dakota electrical safety statutes?

## I.

### A. *Pole and Wire Agreement as Contract of Absolute Liability*

■ Bell's Estate argues East River's Agreement was functionally a contract of insurance:

> [East River] further agrees to release, indemnify and save harmless the Railroad, its successors and assigns, from and against all loss, damages, claims, demands, actions, causes of action, costs and expenses of every character which may result from any injury to or death of any person whomsoever, ... *when such injury, death, loss or damage is caused or contributed to by, or arises out of the existence of said wires, or the construction, installation, maintenance, condition, use or presence of the same upon said railroad premises, or the transmission of electric current by means of said wires.*

Accordingly, the Estate moved for a directed verdict on liability. The trial court denied

the motion and when the Estate read this clause to the jury during closing arguments, the court sustained East River's objection. No explanation for the trial court's decision can be found in the record. To counter the Estate's argument that the power line constituted a trespass, however, East River offered and the court admitted the entire Agreement into evidence. While acknowledging the Agreement was a license to run power lines across Bell's property, the Estate contends the Agreement should also have been considered for its reciprocal legal import, as a contract making East River legally responsible for Bell's death.

The Estate urges us to adopt the reasoning in *Seymour v. Chicago & Northwestern Ry. Co.*, 255 Iowa 780, 124 N.W.2d 157, 162 (1963), interpreting similar language as here. In that case a railroad gave a license allowing a paving company to maintain facilities on the railroad's right-of-way. In a suit brought by an injured third person who collided with a train, the railroad sought to enforce the license agreement requiring the paving company to pay the injured person's damages. The Iowa Supreme Court stated:

> It is not seriously contended that the [railroad] did not have the right to make the agreement, even to the point of holding the [paving company] liable if the operation of the railroad caused or contributed thereto.

*Id.* at 160. The *Seymour* court held the licensee contractually liable inasmuch as the agreement constituted an absolute promise to pay. As it may apply to our case, two circumstances distinguish *Seymour:* (1) There, the railroad was not negligent, and if it were, (2) the license agreement specifically stated the paving company would still be liable even if the operation of the railroad caused or contributed to the loss. The necessity of specific language to contractually shift negligence liability is illustrated in the next case.

In *Chicago & N.W. Transp. Co. v. V & R Sawmill*, 501 F.Supp. 278 (D.S.D.1980), a nearly identical license agreement was at issue. There, Judge Bogue acknowledged:

> The general rule, which has been adopted in South Dakota and elsewhere in the Eighth Circuit, holds that to relieve a party of the consequences of its own negli-

gence the language of the agreement must be clear and unequivocal. *Becker v. Black & Veatch Consulting Engineers*, 509 F.2d 42 (8th Cir.1974); *Associated Engineers, Inc. v. Job*, 370 F.2d 633 (8th Cir.1966); *Bartak v. Bell–Gallyardt & Wells, Inc.*, 473 F.Supp. 737 (D.S.D.1979), rev'd on other grounds, 629 F.2d 523 (8th Cir.1980); *Schull Construction Co. v. Koenig*, 80 S.D. 224, 121 N.W.2d 559, 562 (1963). There is a split of authority on the question of whether the term "negligence" must actually appear in the agreement in order to relieve a party of the consequences of its own negligence. (Citations omitted.)

*Id.* at 281. Interpreting the licensing agreement in question, the court found the phrase, "even though the operation of the Railway Company's railroad may have caused or contributed thereto" sufficiently clear to establish an intent to provide a railway with indemnity for its own negligence.

Here, the Agreement instead provides East River will be responsible for damages resulting in death to "any person whomsoever" when such death is "caused or contributed to by, or arises out of the existence of said wires...." This clause, the Estate argues, is expansive enough to cloak Bell's own negligence. The language is indeed broad, but it does not unequivocally relieve Bell (as the Railroad's successor) of his own negligence. It makes no mention of negligence on the part of the railroad and is silent in coping with instances of loss caused or contributed to by the railroad. Moreover, with the jury having found Bell assumed the risk, no language in the Agreement explicitly allows recompense to persons who knowingly decide to undertake the risk of injury or death. Bell's Estate cannot hold East River contractually liable for Bell's death.

### B. *Power Line Minimum Height*

■ Bell's Estate submits liability must be imposed against East River because it violated the Agreement's clause mandating power lines be at least "32 feet above the top of the rails of the said tracks." East River's power line was 25′8″ at the point where it traversed the peak of Bell's pole barn. Though it is disputed when, if ever, tracks were last on the property, no tracks ran beneath the line when the accident occurred. The plain lan-

guage of the Agreement does not require the 32' height to be maintained where there are no tracks. *American State Bank v. Adkins,* 458 N.W.2d 807, 809 (S.D.1990).

### C. *Power Line Interference With Construction*

■ Another clause in the Agreement provided East River

> shall not do anything upon the premises of the railroad which will in any way interfere with any facilities or improvements now or hereafter constructed ... which will in any way obstruct, interfere with or endanger railroad operation ... [and] strictly conform to all directions and requirements of the railroad in the performance of any work authorized or to be done hereby.

Bell's Estate interprets this language to mean East River must anticipate construction which may potentially interfere with power lines and move them and failure to do so imposes liability for any loss which may result. A fair reading, however, requires East River to cooperate upon demand, not constantly monitor for new construction. *See Butterfield v. Citibank of South Dakota,* 437 N.W.2d 857, 858 (S.D.1989) (interpretation of a contract is a matter of law fully reviewable by this Court).

### II.

*Jury instruction on assumption of the risk.*

■ Bell's Estate argues the trial court erred in instructing the jury on assumption of the risk, because there was "a dearth of evidence that Bell would have had knowledge or appreciation of the fact that he could have been arced by electricity emanating from this high-voltage, uninsulated line." In *Westover v. East River Elec. Power,* 488 N.W.2d 892, 900 (S.D.1992), we reiterated the test to determine if an injured party assumed the risk: The injured party must have (1) actual or constructive knowledge of the risk, (2) an appreciation of the risk's character, and (3) voluntarily accepted the risk, having had the time, knowledge, and experience to make an intelligent choice. Assumption of the risk is an affirmative defense which must be pled and proved by the party asserting it. *Nelson v. Nelson Cattle Co.,* 513 N.W.2d 900, 904 (S.D.1994). In *Nelson* we upheld a jury's finding that an injured party did not assume

the risk. *Id.* at 904. There an inexperienced part-time farm hand was told by experienced movers to climb on top of a portable grain bin and was given a homemade tool to lift an overhead electrical line so the bin could be moved underneath. After the tool broke, the plaintiff was injured in a fall from the bin. Evidence at trial established the plaintiff did not know he would be expected to move wires. We agreed the jury could reasonably conclude from the evidence that the plaintiff did not appreciate the risk of the task he was asked to undertake. *Id.* "A person can be deemed to appreciate a risk if it is a risk that no adult person of average intelligence can deny." *Id.* at 905 (quoting *Westover,* 488 N.W.2d at 901).

On the other hand, Bell, an experienced contractor, constructed the building beneath what he knew was a high power line leaving less than a five foot clearance, without notifying East River or requesting it to move or de-energize its line. On several occasions while installing the metal roof, including the day of the accident, he crawled or walked on the building within close proximity of the electrical line. Bell knew the danger, knew the line was "hot," and even warned others to be cautious of it when on the roof. East River presented evidence concerning Bell's intelligence, his general knowledge of the danger of electricity, his change of construction plans, and the line's visibility. The trial court outlined the *Westover* criteria permitting the jury to apply the evidence to the law. East River's evidence certainly established a fact question for the jury on this issue. *Mash v. Cutler,* 488 N.W.2d 642 (S.D.1992); *Stormo v. Strong,* 469 N.W.2d 816, 825 (S.D. 1991).

■ The Estate next argues that because no one knows exactly what happened to Bell when he was electrocuted, the trial court erred in refusing to give the Estate's proposed instruction based upon *Theunissen v. Brisky,* 438 N.W.2d 221 (S.D.1989):

> There is a presumption, in the absence of evidence to the contrary, that a person killed in an accident such as this one was exercising due care for his protection at, and immediately before, the accident.

East River argues the presumption of due care disappears when direct or circumstantial

evidence is introduced from which facts to the contrary can be adduced. *Id.* at 224; *Wibeto v. Ristvedt,* 83 S.D. 221, 157 N.W.2d 343, 345–46 (1968) (presumption decedent exercised due care defeated by opposing prima facie evidence). South Dakota adopted a modified version of FRE 301:

> In all civil actions and proceedings, unless otherwise provided for by statute or by chapters 19–9 to 19–18, inclusive, a presumption imposes on the party against whom it is directed the burden of going forward with evidence to rebut or meet the presumption, but does not shift to such party the burden of proof in the sense of the risk of nonpersuasion, which remains throughout the trial upon the party on whom it was originally cast. *When substantial, credible evidence has been introduced to rebut the presumption, it shall disappear from the action, or proceeding, and the jury shall not be instructed thereon.*

SDCL 19–11–1 (emphasis added). The term "substantial, credible evidence" remains undefined, but certainly it "was intended to give a presumption greater strength by requiring much more to defeat it than a mere 'tapping on the window.'" John W. Larson, SOUTH DAKOTA EVIDENCE § 301.1 (1991) (also discussing the difficulties with this rule). Under the particular facts of this case, we conclude substantial, credible evidence rebutted the due care presumption, especially as we find the circumstances justified an assumption of the risk instruction.

### III.

*Jury instruction on safety statutes.*

■ Over the Estate's objection, the court instructed that the jury could consider as negligence a violation of SDCL 49–32–11, 49–32–12, or 49–32–14. These statutes prohibit activity within six feet of high voltage electrical lines. An unexcused "violation of a statute enacted to promote safety constitutes negligence per se." *Engel v. Stock,* 88 S.D. 579, 225 N.W.2d 872, 873 (1975); *Bothern v. Peterson,* 83 S.D. 84, 155 N.W.2d 308 (1967); *Blakey v. Boos,* 83 S.D. 1, 153 N.W.2d 305 (1967). The Estate contends these are not safety statutes. We need not determine this issue because the jury found Bell to have

assumed the risk and did not answer the special verdict form questions concerning Bell's possible negligence. A party must prove not only error in the instructions, but prejudicial error to the effect that under the evidence, the jury probably would have returned a different verdict. *Darrow v. Schumacher,* 495 N.W.2d 511 (S.D.1993). As the jury never reached the question of Bell's contributory negligence, Bell's Estate has failed to show how these instructions relating to contributory negligence would have resulted in a different verdict on assumption of the risk had they not been given.

Affirmed.

MILLER, C.J., and SABERS, AMUNDSON and GILBERTSON, JJ., concur.