#26809, #26818-a-DG
**2014 S.D. 56**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

KREISERS INC.; DAVID H. LARSON;
DAVID A. LARSON, JR.; CHRISTOPHER
N. LARSON; SCOTT R. LARSON; and
PHILIP L. JOHNSON,                                    Plaintiffs and Appellees,

        v.

FIRST DAKOTA TITLE LIMITED
PARTNERSHIP d/b/a FIRST
DAKOTA TITLE and d/b/a THE
TITLE RESOURCE NETWORK,                              Defendants and Appellants.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SECOND JUDICIAL CIRCUIT
MINNEHAHA COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE STUART L. TIEDE
Judge

* * * *

TIMOTHY M. GEBHART
Davenport, Evans, Hurwitz
   & Smith, LLP
Sioux Falls, South Dakota                           Attorneys for plaintiffs and
                                                    appellees.


THOMAS K. WILKA
Hagen, Wilka & Archer, LLP
Sioux Falls, South Dakota                           Attorneys for defendants and
                                                    appellants.

* * * *

CONSIDERED ON BRIEFS
MAY 27, 2014
OPINION FILED **07/30/14**

#26809, #26818

GILBERTSON, Chief Justice

[¶1.]        Kreisers Inc. hired First Dakota Title to assist it with a like-kind property exchange in order to receive tax deferred benefits under 26 U.S.C. § 1031. After a partial failure of that exchange, Kreisers sued First Dakota for negligence and negligent misrepresentation.  The circuit court determined that First Dakota was negligent in assisting Kreisers with the exchange.  First Dakota appeals.  We affirm.

## FACTS AND PROCEDURAL HISTORY

[¶2.]        Kreisers Inc. is a Subchapter S corporation that distributes and sells medical supplies.  Its principal office is located in Sioux Falls, South Dakota.  In 2006, Kreisers owned real property (hereinafter "relinquished property") located on South Minnesota Avenue in Sioux Falls.  Kreisers moved its business from the relinquished property in 2001, and placed the property on the market for sale in 2005.  Around the time Kreisers placed the relinquished property on the market, it sought to acquire replacement property for warehouse services.  Kreisers retained Dan Tunge to market the relinquished property and to assist with locating and acquiring replacement property.  Tunge was informed that Kreisers was interested in pursuing a possible like-kind property exchange under 26 U.S.C. § 1031.[1]

---

1.        § 1031 provides in part:

> No gain or loss shall be recognized on the exchange of property
> held for productive use in a trade or business or for investment
> if such property is exchanged solely for property of like kind
> which is to be held either for productive use in a trade or
> business or for investment.

[¶3.]        In October 2006, Kreisers accepted an offer to sell the relinquished property to Urology Specialists Chartered for $765,000. Philip Johnson, an accountant and the eventual Chief Financial Officer of Kreisers, was already contemplating a like-kind exchange at this time; however, he knew little about § 1031 exchanges. Accordingly, officers from Kreisers met with MSM McGladrey, Inc., an accounting firm that performed regulation accounting and tax services for Kreisers and some of its shareholders. Following the meeting, Jason Zanderson and Tracy Peterson of McGladrey sent Johnson a memo on October 20, 2006, regarding like-kind exchanges of property. The memo discussed a new building to be constructed on replacement property as part of the like-kind exchange.

[¶4.]        Prior to receiving the offer from Urology Specialists, Tunge had located possible replacement property in the Sioux Falls Industrial Park in the northeast part of Sioux Falls. Kreisers hoped to construct a new warehouse facility on the replacement property. On October 20, 2006, Kreisers entered into a purchase agreement with the Sioux Falls Development Foundation, Inc. to purchase the replacement property for $356,160.

[¶5.]        Following the agreement to purchase the replacement property, Kreisers began preliminary work on developing plans for the construction of a new warehouse to be built on the replacement property. In March 2007, Kreisers selected Peska Construction as the contractor. A final contract between the parties was executed in May 2007. Peska Construction was informed of the § 1031 exchange and of the requisite time constraints for completing such an exchange.

[¶6.] On February 28, 2007, Urology Specialists assigned its purchase agreement with Kreisers to Brenkevco Properties LLC by written agreement. Shortly after the signing of the Brenkevco agreement, Tunge recommended that Johnson contact James Rogers of First Dakota Title regarding the possibility of First Dakota assisting Kreisers with a § 1031 exchange. Rogers, who is an attorney, was the manager of the title department at First Dakota. First Dakota advertised that it could provide § 1031 tax deferred exchange services. It did not advertise any limits on the types of § 1031 services it provided.

[¶7.] Sometime in early March 2007, Johnson called Rogers. The conversation was brief, lasting about three to four minutes. Johnson informed Rogers that Kreisers was working with McGladrey on a § 1031 exchange. Rogers testified that he recalled discussing a § 1031 exchange with Johnson, but did not remember the specifics of the conversation. Rogers told Johnson that First Dakota performed § 1031 exchange services. Rogers did not rely on a checklist of information and did not recall asking Johnson many questions. First Dakota had no written protocol or procedures to guide its employees in connection with § 1031 exchanges. There is no evidence that Johnson and Rogers discussed an improvement (or construction) § 1031 exchange. Johnson testified that he told Rogers to call Zanderson of McGladrey. Rogers did not call Zanderson, and Johnson did not instruct Zanderson to call Rogers.

[¶8.] A closing date was set for both the replacement property and the relinquished property. To comply with § 1031, closing on the relinquished property occurred first. First Dakota agreed to act as the closing agent and to provide § 1031

exchange services. Rogers was charged with assembling the necessary information for a § 1031 exchange, which included preparing documents that had been created by Attorney Sam Assam, who was retained by First Dakota to draft a series of form documents for § 1031 exchanges. After preparing the documents, Rogers sent them back to Assam for review.

[¶9.] Assam's documents were only meant for forward § 1031 exchanges as it was First Dakota's policy to only handle forward or delayed exchanges. In a forward exchange, First Dakota would act as a "qualified intermediary." It would take an assignment of the purchase agreement from the seller of property and act as a seller for purposes of facilitating a § 1031 exchange. It would then receive the sale proceeds from the purchaser of the relinquished property following closing and agree to hold and use those proceeds to purchase replacement property for the seller at a later closing. First Dakota, as a matter of policy, did not handle construction exchanges, although they did not advertise this restriction.[2]

[¶10.] Rogers did not ask whether Kreisers intended a construction exchange instead of a forward exchange. Although it was normally his practice to contact a client's attorney or accountant to discuss the details of a § 1031 exchange, Assam did not do so in this case. Assam reviewed the documents, but did not discuss with Kreisers or Rogers whether something other than a forward exchange was contemplated.

---

2.    It is undisputed that a construction exchange is slightly more complex than a forward exchange. A construction exchange requires the parties to designate the improvements that will be made to the replacement property. Those improvements must be then made within 180 days.

[¶11.]     Kreisers closed on the relinquished property at the office of First Dakota on April 16, 2007. The closing was conducted in phases with the buyer and seller meeting separately to execute the necessary documents. David H. Larson, President of Kreisers, and Johnson represented Kreisers at the closing. The closing agent for First Dakota was Sue Reiff. Tunge was also present.

[¶12.]     At closing, First Dakota provided Kreisers with the closing documents, including the § 1031 documents that had been prepared by Rogers and reviewed by Assam. Reiff briefly summarized each document for Larson and Johnson while Larson signed the documents. Johnson testified that he talked about the warehouse construction project at the closing. Larson did not recall any such conversation. Reiff stated that she had no independent recollection of the closing, but testified that if there was any indication that Kreisers intended a construction exchange, rather than a forward exchange, she would have stopped the closing to obtain additional guidance because of First Dakota's policy of not handling construction exchanges.[3] Reiff told Larson and Johnson that she would fill in the property description on the form required to designate the replacement property. Larson signed the blank description form. Reiff later completed the designation of replacement property by describing the replacement property that was to be purchased from the Foundation. Reiff never sent the completed form to Kreisers.

[¶13.]     Kreisers closed on the replacement property at First Dakota on April 19, 2007. Mary Olson handled the closing for First Dakota on April 19. Once again, First Dakota acted as both the closing agent and the qualified intermediary for the

_____

3.     Tunge did not testify at trial.

§ 1031 exchange; and both the buyer and the seller met separately with First Dakota. Larson and Johnson represented Kreisers at the closing. The closing lasted about five minutes. There was no discussion regarding a construction exchange. There is no evidence that Kreisers read the closing documents or that their attorneys reviewed the documents.

[¶14.] The Foundation delivered a warranty deed dated April 20, 2007, to First Dakota conveying title to the replacement property. The deed was recorded by First Dakota on April 25. Kreisers was not provided a copy of the deed at closing. The deed and final owner's policy of title insurance were not mailed to Kreisers until July 1, 2007.

[¶15.] Following closing, First Dakota held the excess proceeds of $328,733.87, which represented the difference between the net cash received from the sale of the relinquished property and the amounts paid by Kreisers for closing costs and the purchase of the replacement property. Kreisers had 45 days from the closing of the relinquished property to designate replacement property. First Dakota knew that Kreisers had designated the property from the Foundation as replacement property.

[¶16.] On or around June 30, 2007, and after the expiration of the 45 days, Peska submitted to Kreisers its first request for payment for its construction of the warehouse on the replacement property. Johnson instructed First Dakota to pay Peska from the excess proceeds still retained by First Dakota. Rogers informed Johnson that Kreisers's § 1031 exchange was not qualified as a construction exchange. Johnson contacted Zanderson at McGladrey to see if anything could be

done to salvage the tax deferral on the remaining funds. Rogers spoke with Mark Wahlstrom, the President of First Dakota. Wahlstrom instructed Rogers to contact a § 1031 expert to see if the deferral could be salvaged. Rogers contacted Chris Moran of Dakota Homestead Title Insurance Company. Ultimately, no construction proceeds were disbursed by First Dakota to Peska, and the remaining funds on deposit were paid to Kreisers on August 27, 2007. As a result, the amount of proceeds from the sale of the relinquished property used to purchase the replacement property qualified for tax deferral. However, the remaining proceeds that were ultimately paid to Kreisers by First Dakota did not qualify for tax deferral, and therefore, were subject to various taxes. The recognized gain for tax purposes was $317,087.

[¶17.] In light of the partial failure of the like-kind exchange, Kreisers sued First Dakota for monetary damages, alleging claims of negligence and negligent misrepresentation against First Dakota. First Dakota asserted that Kreisers was contributorily negligent. The case was tried by a court trial on September 11-13, 2012. The court rejected Kreisers's negligent misrepresentation claim. However, the circuit court determined that First Dakota was negligent in the performance of its duties and that Kreisers was not contributorily negligent. Kreisers was awarded $119,704, plus prejudgment interest, which represented Kreisers's additional tax liability of $172,804 minus certain offsets for tax savings.

[¶18.] On appeal, First Dakota alleges that the circuit court erred because it applied tort law instead of the contract signed by the parties. Similarly, First Dakota argues that the circuit court erred in concluding that First Dakota had a

common law duty beyond the contract entered between First Dakota and Kreisers. Finally, First Dakota claims that Kreisers was contributorily negligent.

[¶19.] Kreisers also filed a notice of appeal in this case. Kreisers argues that the circuit court erred in concluding that First Dakota was not guilty of negligent misrepresentation. Additionally, Kreisers asserts that the circuit court erred in its calculation of damages when it applied certain tax offsets.

## ANALYSIS AND DECISION

[¶20.] *1. Whether the circuit court erred in applying negligence principles rather than the contractual documents.*

[¶21.] First Dakota argues that the circuit court erred in applying tort law rather than contract law to determine what duty First Dakota owed Kreisers. First Dakota asserts that under *Fisher Sand & Gravel Co. v. South Dakota Department of Transportation*, 1997 S.D. 8, 558 N.W.2d 864, Kreisers and First Dakota had no relationship outside of the contract formed by the closing documents. First Dakota maintains that the contractual documents set forth the duties of the parties with respect to the transaction. Whether a duty exists in a negligence action is a question of law that we review de novo. *Patitucci v. City of Hill City*, 2013 S.D. 62, ¶ 9, 836 N.W.2d 623, 626 (citation omitted).

[¶22.] "Tort liability requires 'a breach of a legal duty independent of contract.'" *Schipporeit v. Khan*, 2009 S.D. 96, ¶ 7, 775 N.W.2d 503, 505 (quoting *Grynberg v. Citation Oil & Gas Corp.*, 1997 S.D. 121, ¶ 18, 573 N.W.2d 493, 500). "This independent legal duty must arise 'from extraneous circumstances, not constituting elements of the contract.'" *Id.* (quoting *Grynberg*, 1997 S.D. 121, ¶ 18, 573 N.W.2d at 500). In contrast, "negligence that consists merely in the breach of a

contract will not afford grounds for a tort action by third parties and is limited under a breach of contract cause of action to the party to the contract or for whose benefit the contract was made." *Fisher Sand & Gravel Co.*, 1997 S.D. 8, ¶ 15, 558 N.W.2d at 868.

[¶23.]     The circuit court determined that First Dakota owed Kreisers a common law duty of care that arose when First Dakota held itself out as being qualified to handle § 1031 exchanges. First Dakota agreed to provide these services prior to signing any contract with Kreisers. Therefore, the circuit court concluded that First Dakota had a common law duty to exercise reasonable and proper care in the handling of the § 1031 exchange, including the drafting of the closing documents.

[¶24.]     In an attempt to distinguish the circuit court's decision, First Dakota relies on *Fisher Sand & Gravel Co.*, where this Court rejected a negligence claim against the South Dakota Department of Transportation (DOT). 1997 S.D. 8, ¶ 16, 558 N.W.2d at 868. *Fisher Sand & Gravel Co.* involved a breach of contract claim and a negligence claim brought by Fisher, a supplier of aggregate, against DOT. DOT had accepted a bid for a concrete paving project, with Fisher acting as a subcontractor on the project. However, DOT required Fisher to obtain sand from a different source than was Fisher's custom, which resulted in a "mark up" in the cost of Fisher's performance. *Id.* ¶ 6, 558 N.W.2d at 866. In rejecting Fisher's negligence claim, we noted that Fisher failed to show "that DOT breached any duties, rights, or obligations independent of those imposed upon them under the

contract." *Id.* ¶ 18, 558 N.W.2d at 869. We stated that "[o]utside of the contract there was no relationship between [Fisher and DOT]." *Id.* ¶ 13, 558 N.W.2d at 867.

[¶25.] However, we also observed in *Fisher Sand & Gravel Co.* that "[i]f the relationship of the parties is such as to support a cause of action in tort, that cause of action is not to be denied because the parties happened also to have made a contract." *Id.* ¶ 19, 558 N.W.2d at 869 (quoting *Redgrave v. Boston Symphony Orchestra, Inc.*, 557 F. Supp. 230, 238 (D. Mass. 1983)). Furthermore, "it is generally recognized that one who undertakes to provide professional services has a duty to the person for whom the services are performed to use such skill and care ordinarily exercised by others in the same profession." *Limpert v. Bail*, 447 N.W.2d 48, 51 (S.D. 1989) (citation omitted). And, "[l]iability in tort for breach of that duty may arise as the result of negligence during the performance of the contract, even if there has been no breach of contract." *Id.* (citation omitted).

[¶26.] As the circuit court correctly observed in this case, First Dakota owed a duty of care to Kreisers beyond the contract between the two parties. This case is distinguishable from *Fisher Sand & Gravel Co.* because an independent duty to exercise reasonable care arose from extraneous circumstances not constituting the elements of the contract.[4] Both parties agree that § 1031 exchanges can be incredibly complex. Prior to the signing of the closing documents, First Dakota

---

4. It is also important to note that *Fisher Sand & Gravel Co.* involved a lawsuit against the State of South Dakota. The lawsuit was cognizable under SDCL 31-2-34, which permits a suit "against the South Dakota Department of Transportation [for] any claim, right, or controversy arising out of the work performed, or by virtue of the provisions of any construction contract entered into by the South Dakota Department of Transportation." *Fisher Sand & Gravel Co.*, 1997 S.D. 8, ¶ 9, 558 N.W.2d at 867. We stated that under that statute, "if there is no contract or quasi-contract, there is no lawsuit." *Id.*

advertised that it handled § 1031 exchanges. The advertisement was not limited to forward exchanges. Nevertheless, there is no evidence that Rogers, or anyone else at First Dakota, informed Johnson or anyone else at Kreisers that First Dakota only provided its services in connection with forward exchanges. First Dakota was aware of the different kinds of § 1031 exchanges, but Rogers did not use a checklist or ask any questions of Johnson to gauge his knowledge of § 1031 exchanges so as to ascertain whether Kreisers wanted something other than a forward exchange.

[¶27.]     Moreover, because of the complexity of some § 1031 exchanges, it was customary for First Dakota to refer more complex exchanges—like construction exchanges—to other providers; however, in this case First Dakota did not even inquire or verify whether Kreisers was interested in a construction exchange so as to determine whether Kreisers needed a different provider. Additionally, Assam never inquired into the type of exchange that Kreisers desired. Finally, in completing the forms, Reiff, of First Dakota, instructed Larson, of Kreisers, to sign the blank property description form, which she would fill in later. After doing so, she did not show the completed forms to anyone at Kreisers. David Brown, an attorney who owns a company that provides qualified intermediary services in Iowa, testified as an expert witness in this case. He opined that First Dakota breached the standard of care as a qualified intermediary by failing to gather necessary information and failing to make certain it understood what the client was trying to accomplish and how the transaction was structured. This duty of reasonable care existed independent of any contract that was signed between Kreisers and First Dakota.

[¶28.] As a company providing professional services, First Dakota had, at a minimum, an independent legal duty to exercise reasonable care by ascertaining what the client wanted. The subsequent closing contract did not alleviate that duty. Given that independent duty, the circuit court did not err in applying tort law rather than contract law to determine the duty that First Dakota owed to Kreisers.

*Economic Loss Doctrine*

[¶29.] First Dakota further contends, however, that the economic loss doctrine precludes Kreisers's claim. The economic loss doctrine provides that "purely economic interests are not entitled to protection against mere negligence." *Diamond Surface, Inc. v. State Cement Plant Comm'n*, 1998 S.D. 97, ¶ 22, 583 N.W.2d 155, 160 (citation omitted). The significance of the doctrine is that it "precludes parties under certain circumstances from eschewing the more limited contract remedies and seeking tort remedies." *Ins. Co. of N. Am. v. Cease Elec. Inc.*, 688 N.W.2d 462, 467 (Wisc. 2004). "The prohibition against tort actions to recover solely economic damages for those in contractual privity is designed to prevent parties to a contract from circumventing the allocation of losses set forth in the contract by bringing an action for economic loss in tort." *Tiara Condo. Ass'n, Inc. v. Marsh & McLennan Cos., Inc.*, 110 So. 3d 399, 402 (Fla. 2013) (citation omitted). The "doctrine draws a legal line between contract and tort liability that forbids tort compensation for 'certain types of foreseeable, negligently caused, financial injury.'" *Terracon Consultants Western, Inc. v. Mandalay Resort Grp.*, 206 P.3d 81, 87 (Nev. 2009) (quoting *Barber Lines A/S v. M/V Donau Maru*, 764 F.2d 50, 52 (1st Cir. 1985)). The economic loss doctrine, therefore, sets forth that regardless of whether

a tort duty may exist between contracting parties, the actual duty one party owes to another for purely economic loss should be based exclusively on the contract to which they agreed and assigned their various risks. *See Indianapolis-Marion Cnty. Pub. Library v. Charlier Clark & Linard, P.C.*, 929 N.E.2d 722, 729-30 (Ind. 2010). Kreisers argues that First Dakota's position stretches the doctrine "too far."

[¶30.]     In *City of Lennox v. Mitek Industries, Inc.*, 519 N.W.2d 330, 333 (S.D. 1994), this Court adopted the economic loss doctrine. However, in that case our application of the doctrine was limited to commercial transactions under the Uniform Commercial Code. *See id.* We have not yet extended the doctrine to the type of professional services offered in this case. Effectively, First Dakota asks us to extend that doctrine to this case.

[¶31.]     In formulating our economic loss rule, we cited Minnesota law, which has declined to extend the economic loss doctrine beyond commercial transactions. *See McCarthy Well Co., Inc. v. St. Peter Creamery, Inc.*, 410 N.W.2d 312, 314-15 (Minn. 1987); s*ee also Mitek Industries, Inc.*, 519 N.W.2d at 333. A number of other jurisdictions have also declined to apply the economic loss rule to purely professional services. *See, e.g., Cargill, Inc. v. Boag Cold Storage Warehouse*, 71 F.3d 545, 550 (6th Cir. 1995) (stating that the economic loss doctrine "is associated with 'transactions in goods,' and not transactions in services") (citation omitted); *Cease Elec., Inc.*, 688 N.W.2d at 472 (holding that "the economic loss doctrine is inapplicable to claims for the negligent provision of services"). *But see Terracon Consultants Western, Inc.*, 206 P.3d at 90 (barring a purely economic negligence claim against a design professional under the economic loss doctrine); *2314 Lincoln*

*Park W. Condo. Ass'n v. Mann, Gin, Ebel & Frazier, Ltd.*, 555 N.E.2d 346, 353 (Ill. 1990) (applying the economic loss rule to an alleged claim of architectural malpractice).

[¶32.] Given the nature of the professional services offered by First Dakota to Kreisers, we decline to extend the economic loss doctrine to this case. South Dakota already allows a number of claims, like legal malpractice, to be brought under either breach of contract or negligence. *See Haberer v. Rice*, 511 N.W.2d 279, 286 (S.D. 1994) ("A legal malpractice suit may have two causes of action, one which is for breach of contract and another in negligence."). Moreover, the application of the economic loss doctrine to negligence claims like the one in this case has been soundly rejected elsewhere. *See, e.g., Clark v. Rowe*, 701 N.E.2d 624, 627 (Mass. 1998) ("The general rule in this country is that the economic loss rule is inapplicable to claims of legal malpractice."); *Collins v. Reynard*, 607 N.E.2d 1185, 89 (Ill. 1992) ("[I]t is singularly inappropriate to attempt to apply the economic loss . . . doctrine to attorney malpractice actions."); *see also Congregation of the Passion, Holy Cross Province v. Touche Ross & Co.*, 636 N.E.2d 503, 514-15 (Ill. 1994) (declining to extend the economic loss doctrine to accountant malpractice). The reason for this is that the economic loss rule is usually more appropriate when there is no fiduciary relationship so that the parties can more freely bargain concerning allocation of risk. *See Clark*, 701 N.E.2d at 626 (citation omitted). As Kreisers argues, by extending the economic loss doctrine to this case, we might risk foreclosing future negligence actions for claims like legal malpractice, which quite often only involve

claims for purely economic loss. We decline to reach this result, and hold that the economic loss doctrine does not bar Kreisers's claim.

*Contract Indemnification*

[¶33.]     First Dakota next asks us to consider whether the contract indemnification language in the closing documents bars Kreisers's claim. The Indemnification Agreement between Kreisers and First Dakota provides in part that Kreisers agrees to indemnify First Dakota "in connection with the inability of Kreisers's exchange transaction to qualify for tax deferral pursuant to the provisions of Section 1031 of the Internal Revenue Code, for any reason (except for First Dakota's failure to comply with the provisions of the Exchange Agreement or Supplemental Agreement)."

[¶34.]     "[T]o relieve a party of the consequences of its own negligence the language of [an indemnification] agreement must be clear and unequivocal." *Bell v. E. River Elec. Power Coop., Inc.*, 535 N.W.2d 750, 753 (S.D. 1995) (citations omitted). The circuit court concluded that the contract indemnification was both ambiguous and unhelpful to First Dakota. In concluding that the indemnification provision was unhelpful, the court noted that the Indemnification Agreement provided:

> Kreisers shall, and does hereby agree to indemnify, defend (by counsel reasonably acceptable to First Dakota), protect and hold First Dakota, its general partners, limited partners, officers, employees, attorneys or agents (collectively "Indemnitee") free and harmless from any claim, liability, demand, expense, tax or assessment of any nature or kind, expressed or implied, *whether sounding in tort or in contract that may be asserted against Indemnitee, by any person (other than Kreisers)* . . . .

(Emphasis added). As the circuit court emphasized, the above language appears to exclude Kreisers from the indemnity obligation. Although First Dakota points to a different provision in the agreement to indemnify itself from suit, the two provisions read together at a minimum make the agreement ambiguous.[5] Because our law requires the indemnification language to be "clear and unequivocal," we conclude that the indemnification language does not foreclose Kreisers's negligence claim.

[¶35.]      2.      *Whether the circuit court erred in concluding that Kreisers was not contributorily negligent.*

[¶36.]      First Dakota argues that Kreisers was negligent in failing to read the closing documents and in failing to have its own attorney and accountant review the closing documents before signing them. Contributory negligence is a question of fact, which is reviewed under the clearly erroneous standard. *Wood v. City of Crooks,* 1997 S.D. 20, ¶ 3, 559 N.W.2d 558, 560.

[¶37.]      In support of its position that Kreisers was contributorily negligent, First Dakota underscores that both its transmittal letter dated April 13, 2007, and the Agreement of Indemnification advised Kreisers to consult with its own advisers regarding the transaction. However, as the circuit court noted, these documents were the only suggestion presented to Kreisers that they should consult a different representative. Throughout discussions with various individuals at First Dakota leading up to the transmittal of those documents, there is no evidence that any such advisements were made to representatives of Kreisers. Moreover, as the circuit court highlighted, Kreisers already believed that it had an expert in § 1031

---

5.    The circuit court had previously found the indemnification agreement to be ambiguous in denying First Dakota's motion for summary judgment on December 11, 2011.

exchanges in First Dakota, which never informed Kreisers that its work was limited to forward exchanges. It is important to once again note the complexity of these exchanges. There is no evidence that anyone at Kreisers had any expertise in § 1031 exchanges. Kreisers was putting faith in First Dakota to properly exercise its knowledge and expertise to facilitate the § 1031 exchange. The circuit court's finding that Kreisers was not negligent is not clear error.

[¶38.]     First Dakota next argues that Kreisers failed to take reasonable steps to salvage the tax deferral. Both Attorney Assam and Chris Moran of Dakota Homestead Title Insurance testified that, in their opinion, the transaction could have been salvaged as late as July 2007 if the parties had cooperated. However, neither opined that any attempt to salvage the transaction was guaranteed to be successful. Moreover, Moran's testimony was undercut by his own memorandum to Rogers where he stated that any attempt to fix the problem at that late of a date would be a "bad move." The circuit court ultimately relied on the fact that none of First Dakota's expert witnesses were willing to guarantee a fix without substantial risk. The circuit court, therefore, found that it was reasonable for Kreisers to decide not to try to unwind the transaction and re-structure it in an effort to fully qualify under § 1031. Given this reasoning, we find no error with the circuit court's finding on this issue.

[¶39.]     3.     *Whether the circuit court erred in its calculation of damages.*

[¶40.]     Kreisers asks us to consider whether the circuit court erred in its calculation of damages. "The amount of damages to be awarded is a factual issue . . . ." *Weekley v. Wagner*, 2012 S.D. 10, ¶ 13, 810 N.W.2d 340, 343 (citations omitted).

"Damages must be reasonable and must be proved with reasonable certainty." *Id.* (citation omitted). "Reasonable certainty 'requires proof of a rational basis for measuring loss,' without requiring the trier of fact to speculate." *Id.* (quoting *Lord v. Hy-Vee Food Stores*, 2006 S.D. 70, ¶ 31, 720 N.W.2d 443, 454). "This Court reviews the issue of damages under the clearly erroneous standard." *Id.* (citation omitted).

[¶41.]        There is no dispute that Kreisers had to pay $172,804 in tax liabilities as a result of the partial failure of the like-kind exchange. Kreisers contends, however, that the circuit court erred in its calculation of certain tax offsets.

[¶42.]        In calculating damages, the circuit court considered the testimony of both Zanderson and John Wenande, a certified public accountant and the expert witness for First Dakota. Wenande testified that the additional taxes paid by Kreisers in 2007 needed to be offset by the additional depreciation available to Kreisers on the increased basis for the newly constructed building as well as the increased basis in the stock of the shareholders of Kreisers. Wenande calculated the net present value of the future tax savings at $49,600. Wenande also determined that a second offset needed to be made for tax savings on the personal tax return of Larson as a result of deducting additional state taxes (from Iowa) he paid in 2007. Wenande calculated that Larson had tax savings of $3,500 in 2008.

[¶43.]        While Zanderson agreed with Wenande that there would be some offsets, he differed on the amount. Zanderson believed that Wenande's calculations were speculative. First, Zanderson disagreed with Wenande's assumption of a 33 percent tax rate, testifying that Kreisers's historical tax rate was 23 percent.

Additionally, Wenande used a 4.4 percent discount rate, while Zanderson believed a more appropriate rate was 5.08 percent in light of the historical rate of return experienced by Kreisers. Zanderson calculated the offset due to the increased depreciation to be only $3,000. Zanderson also opined that Larson's actual savings were closer to $1,000, instead of the $3,000 savings predicted by Wenande.

[¶44.]       There was no dispute that the stepped up basis in the warehouse permits additional depreciation deductions over the useful life of the property. After weighing the opinions of both expert witnesses, the circuit court ultimately found Wenande's opinion regarding certain offsets "to generally be more reliable and on a more sound foundation."

[¶45.]       On appeal, Kreisers posits that the "tax benefit rule" illustrates the erroneousness and speculative nature of Wenande's opinion and the circuit court's decision. "The tax benefit rule is a judicially developed principle that is codified in part in the Internal Revenue Code, 26 U.S.C.A. § 111, and prevents plaintiffs from reaping multiple recoveries." *Cody v. Edward D. Jones & Co.*, 502 N.W.2d 558, 561-62 (S.D. 1993) (citation omitted). Furthermore, we have stated that "public policy supports disregarding tax benefits in awarding damages." *Id.* at 562. This is because "[t]here is a deterrent value against committing fraud if the fraudulent party realizes he will have to compensate the other party for the full extent of his damages with no offset for any tax benefits the other party may have received." *Id.* (citation omitted).

[¶46.]       In response to Kreisers's "tax benefit rule" claim, First Dakota alleges that this issue was not properly raised before the circuit court, and is therefore

waived. We have consistently stated that we will not address issues raised for the first time on appeal not raised before the lower court. *Hall v. S.D. Dep't of Transp.*, 2006 S.D. 24, ¶ 12, 712 N.W.2d 22, 26-27 (citation omitted). After a review of the record, it does not appear that Kreisers fully presented this argument before the circuit court. Because the circuit court and First Dakota did not have an opportunity to fully address and consider the application of the tax benefit rule, we decline to reach it here.

[¶47.] The circuit court was therefore left to determine the extent of damages based on the testimony of two competing expert witnesses. We have acknowledged that "[d]amages are speculative, not when the amount is uncertain, but when the fact of damages is uncertain." *Bailey v. Duling*, 2013 S.D. 15, ¶ 35, 827 N.W.2d 351, 363 (citation omitted). And "courts have some leeway in calculating damages . . . ." *Weekley v. Prostrollo*, 2010 S.D. 13, ¶ 24, 778 N.W.2d 823, 830. Ultimately, the fact of damages in this case was not in dispute, and the court found Wenande's opinion to be more reliable on the amount of damages. Accordingly, we conclude that the circuit court did not clearly err in its calculation of damages.

[¶48.] We affirm the circuit court on all issues.[6]

[¶49.] KONENKAMP, ZINTER, SEVERSON, and WILBUR, Justices, concur.

---

6. Because we conclude that First Dakota was negligent, we do not consider whether First Dakota was also guilty of negligent misrepresentation as Kreisers would not be entitled to additional damages on that claim.