#28269-r-JMK
**2018 S.D. 64**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

ISG, CORP.,                                    Plaintiff and Appellant,

v.

PLE, INC. and
MARC O. BOGUE,                                 Defendants and Appellees.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE FIRST JUDICIAL CIRCUIT
UNION COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE STEVEN R. JENSEN
Judge

* * * *

JOSHUA D. ZELLMER
Myers Billion, LLP
Sioux Falls, South Dakota

LEON N. PATRICIOS
Zumpano, Patricious & Winkler, P.A.          Attorneys for plaintiff and
Coral Gables, Florida                        appellant.

PETER J. BENDORF
Bendorf Law Firm, PLLC
Sioux Falls, South Dakota

PHILLIP O. PETERSON
Peterson, Stuart, Rumpca
  & Rasmussen                                Attorneys for defendants and
Beresford, South Dakota                      appellees.

* * * *

CONSIDERED ON BRIEFS
FEBRUARY 12, 2018
OPINION FILED **08/22/18**

#28269

KERN, Justice

[¶1.]	International Services Group Corp. (ISG) contracted with Portable Lift Equipment Inc. (PLE) to build two observation platforms for use by law enforcement at an annual festival held in San Juan, Puerto Rico. PLE did not deliver the platforms they agreed to build and instead delivered a used, contractually noncompliant platform. ISG sued PLE and its president for breach of contract and fraud. The case went to trial, and the jury found in favor of ISG, awarding both compensatory and punitive damages. PLE filed a motion for a new trial. The circuit court denied the motion on the issue of liability but granted a new trial on the issue of damages. We reverse and remand.

## Facts and Procedural History

[¶2.]	In fall 2013, the Puerto Rican Police Department (Department) contracted with ISG, a security company, to provide and maintain two tactical observation platforms (TOPs).[1] TOPs consist of a pod, which is an enclosed structure capable of holding two to four individuals, raised from a mobile trailer via a scissor lift or stack. The Department needed the TOPs by early January 2014 for use at the annual San Sebastian Street Festival held in San Juan, Puerto Rico. The year prior, a violent altercation occurred resulting in a homicide, prompting law enforcement to enhance security at the event by providing a more visible presence.

---

1.	ISG claims that it was a well-respected security company that worked with the Department and the municipality of San Juan. It provided services such as police and personnel training, design and installation of closed-circuit camera systems, and security consultations.

-1-

The contract required that the TOPs be equipped with Level III National Institute of Justice (NIJ)[2] ballistics-rated protection. The Department agreed to lease the TOPs for three years for $824,658.94, and the parties later agreed to amend the contract so that the Department could purchase the TOPs. ISG's president, Jesus Roman, testified that the Department agreed to a down payment of $366,490.

[¶3.]    To fulfill the contract, ISG first attempted to purchase TOPs manufactured by FLIR Systems Inc., an industry leader in the field, but FLIR could not build and ship the TOPs before the festival. Roman, looking for alternatives, discovered PLE while researching online for companies based in the United States. PLE, located in Beresford, South Dakota, sells lift equipment, including TOPs. The company consists of Marc Bogue (Bogue), PLE's president; his wife, Lisa, who works as the office manager; Bogue's nephew Steve Bogue (Steve), PLE's engineer; and Craig Stubbe, PLE's general manager. In September 2013, Roman began corresponding with PLE by phone and email. Roman explained that he needed two TOPs by December 31, 2013 for the January 2014 festival. On October 18, 2013, Roman sent PLE a quote from FLIR listing various ballistics-protection options, and Roman testified that he told Bogue that he needed "exactly the same thing that FLIR [could] provide." According to the quote provided by FLIR, the cost for two units would be $379,963.51.

[¶4.]    On October 26, 2013, Roman visited PLE's factory in Beresford. Roman testified that no one expressed any concerns about building the TOPS or

---

2.    NIJ categorizes ballistic-protection performance into five levels, from least protection to highest: Level IIA, Level II, Level IIIA, Level III, and Level IV.

completing the project by the deadline. However, Bogue testified that PLE had never manufactured or sourced any materials with ballistic protection and that he did not know what NIJ Level III stood for when Roman sent PLE the quote from FLIR. Bogue also did not know how much weight ballistic protection would add to the pod. Nevertheless, Bogue did not confer with Steve or Stubbe before sending the quote and did not hire an engineer or ballistics expert to determine whether PLE had the ability to manufacture a TOP with ballistic protection. Although Bogue failed to disclose this information to Roman, he insisted at trial that "there was nothing that would have led [Roman] to believe that we could do Level III ballistic protection at that particular time." Yet Bogue admitted that, at the time of the meeting, he understood the TOPs needed NIJ Level III-rated ballistic protection.

[¶5.] Following their meeting, PLE sent Roman an invoice totaling $317,418 and requested a 50% deposit. On October 30, 2013, Roman wired $158,699 to PLE. After receiving ISG's payment, PLE began working on the TOPs. However, in early November 2013, PLE discovered issues pertaining to both lift capacity and pricing. On November 9, 2013, Bogue sent Roman an email outlining possible ways to proceed, including to "stay the course" and build unarmored or lightly armored pods. Three days earlier, Steve sent Bogue an email informing Bogue that the quotes for outsourcing pods "came in too high," requiring that they build the pods themselves, a process that would move the project back to the end of January or sometime in February 2014. Bogue did not disclose this information to Roman. Roman responded on November 11, 2013, agreeing to use two unarmored TOPs

until PLE finished the Level III-rated units. That same day, Stubbe privately informed Bogue that the unarmored TOPs would be completed "in late January at [the] earliest" and the armored TOPs "may be 6 months or more."

[¶6.] On November 28, 2013, Bogue emailed Roman and explained that although they were "staying the course," "winter storms across the US ha[d] pushed [PLE] back about one week as vendors were unable to produce product for [them]." Bogue advised Roman about a "NIJ 3 unit" available in San Diego, stating that he believed delivery of the California TOP could occur in 30 days. As for the armored TOPs, Bogue stated that manufacturing would have a lead time of eighteen weeks.

[¶7.] Roman and Stubbe traveled to San Diego to inspect the TOP, which was dubbed "Eagle Eye." As a result of their inspection, they developed a list of problems with Eagle Eye requiring correction before it could be put into service, including that it only had level NIJ IIIA protection. Roman flew back to Puerto Rico to inform the Department about Eagle Eye and to ask if they would accept it. Stubbe remained in California, tasked with completing the repairs. PLE sent ISG an invoice charging $158,709 for Eagle Eye and $7,000 for shipping from California to Jacksonville, Florida, to stage for transport to Puerto Rico. Roman testified that PLE promised to upgrade Eagle Eye to NIJ level III protection after its arrival in Puerto Rico.

[¶8.] On December 13, 2013, PLE invoiced ISG for $80,699 as a partial payment on the second TOP under construction in Beresford. ISG wired the money to PLE. However, by December 31, PLE had not delivered the PLE-manufactured TOPs to ISG. On that day, Bogue sent Roman an email with deadlines for project

milestones, including January 20, 2014, when PLE would "[s]hip Aero Top[3] to Puerto Rico or ship Eagle Eye[,]" and February 28 for shipping the second unit.

[¶9.]     In December 2013, PLE shipped Eagle Eye from Florida to Puerto Rico but it was nonfunctional upon arrival, requiring repairs and upgrading by ISG before it could be used by the police.  Roman testified that ISG worked "twenty-four hours [a day] for seven days" to get Eagle Eye ready for the festival.  ISG presented evidence that the value of this work would exceed $100,000 if done by outside sources, requiring $25,000 to design a new pod for Eagle Eye and $98,500 to manufacture it.

[¶10.]    On January 28, 2014, Bogue sent Roman an email explaining that the first of the PLE-manufactured TOPs would be completed around March 15 or "[s]ooner if [the parties came] to a compromise" on ballistics protection.  Bogue reiterated the problems PLE had been experiencing with the weight of the pods and proposed that the police simply position portable shields while in the pod's cabin. Bogue stated that they would "continue the course" if such a compromise could be reached; however, if not, Bogue believed "[t]he only option [would be] to do a complete new design with a" new stack, requiring an additional fourteen weeks and more money.

[¶11.]    On February 10, 2014, Stubbe emailed Bogue to inform him that their current lift could not handle an armored pod, regardless of the level of protection it offered.  Stubbe recommended that PLE either take the time and expense to build the pod ISG requested or "bow out and return the deposit," though he was not sure

---

3.     This was one of the two unarmored TOPs PLE agreed to build.

PLE could do either. Disregarding Stubbe's opinion, on February 14, 2014, Bogue emailed Roman and told him that they were "bringing in a ballistics expert from Minneapolis to oversee final assembly . . . ." At trial, Bogue admitted that no such expert had been hired and that this statement was false.

[¶12.]     On February 24, 2014, Roman emailed Bogue about his recent meeting with the San Juan police commissioner, stating he needed the TOPs done in fifteen to twenty days as the Department would not accept any more excuses. On March 1, Bogue emailed Roman and told him that PLE "continue[d] to work diligently" and that the arrival of a stack "ha[d] been delayed slightly because of weather." On March 6, Roman informed Bogue that a Department committee demanded he provide a date for when the second TOP would arrive and a letter from PLE indicating the TOP's anticipated completion date. Bogue responded that "[m]ajor components have arrived or are in transit," but that "[s]nowstorms and weather are still delaying the arrival of some significant parts . . . ." Bogue insisted, however, that "all major components . . . [would] arrive [the] next week" and that they hoped to have the TOP finished by the end of the month. At trial, Bogue admitted that these statements were false as he had not yet ordered the pod or the trailer.

[¶13.]     On March 19, 2014, Roman emailed Bogue to inform him that the Department was considering cancelling the contract and that they needed the second TOP as soon as possible. On June 9, 2014, Bogue sent an email stating that PLE was "close to having the pod." On June 14, Roman emailed Bogue and explained that a recent meeting with the Department went poorly and that he expected to meet with the Department's legal counsel the coming Tuesday. On

June 15, Bogue responded that he would "deliver [ISG] an exceptional and safe product" and that the Department would be "very happy with the final product."

[¶14.] By September 2014, PLE had yet to ship the second TOP or upgrade Eagle Eye. Roman emailed Bogue on September 4, 2014, stating that it had been a "[l]ong time that I don't get any feedback on the TOP that [was] still [being] manufactured" and that the Department had cancelled their contract with ISG. To avoid being fined by the government, ISG demanded that PLE upgrade Eagle Eye to NIJ Level III protection. Roman also requested that all costs related to Eagle Eye be paid by PLE and that any money still in PLE's possession be returned to ISG.

[¶15.] In October 2014, PLE completed assembly of the second TOP's pod. Roman flew to Beresford to inspect the unit and discovered that it did not conform to the contact's specifications, lacking, among other things, NIJ Level III-rated protection. ISG sued PLE for breach of contract, fraud,[4] deceit, negligent misrepresentation, conversion, and, in the alternative, unjust enrichment. ISG also sued Bogue individually for fraud, deceit, and negligent misrepresentation.

---

4. The jury received the same instructions on fraudulent misrepresentation with respect to both ISG's claim that PLE fraudulently induced ISG to enter into the contract in October 2013 for the TOP's and ISG's claim that PLE fraudulently induced ISG to transfer another $80,699 in December 2013. The special-verdict form used the same language when referring to each claim, asking the jury whether it believed that Bogue made "fraudulent misrepresentations in order to induce Plaintiff . . . ." In ISG's briefs on appeal, ISG refers to the first claim as "fraudulent inducement" and the second claim as "fraudulent misrepresentation." For ease of distinguishing the two claims, we have adopted the same shorthand.

[¶16.] On March 20–24, 2017, the circuit court held a jury trial and at the close of the evidence three counts were submitted to the jury: breach of contract against PLE, and fraud in the inducement and fraudulent misrepresentation against PLE and Bogue. Roman testified that the events of this case ruined his reputation and that the government and private sector effectively blacklisted ISG. According to Roman, ISG lost lucrative contracts with entities like the City of San Juan and the University of Puerto Rico, the latter of which meant losing "roughly . . . two hundred [thousand], two hundred something a year." As a result, ISG released its entire staff of forty employees. Roman also testified that ISG had expected to make a profit of $507,240.94 on the San Sebastian contract, which was the $824,658.94 contract price minus the $317,418 that PLE invoiced ISG.

[¶17.] On cross-examination, opposing counsel asked Roman whether he had provided any documentation of employment records or payments made by the Department. Roman admitted that he had not. The jury did, however, receive defendant's Exhibit 76, a history of payments made by the Department to ISG, which included payments for the contract in this case and other projects that Roman testified predated this dispute. Exhibit 76 established that ISG received $366,490.00 from the government in October 2013, the down payment for the two TOPs, as well as payments for prior projects and a total payment amount of $478,955.29 to ISG. The last payment made was on July 22, 2016. During closing argument, ISG argued that, per Exhibit 76, "Roman had received and will no longer receive $112,465.00 from the" Department. ISG arrived at this amount by subtracting the $366,490 down payment from $478,955.29, the total amount of

money ISG received from the Department between 2010 and 2016 as shown on Exhibit 76.

[¶18.] The court instructed the jury that it should determine liability on each issue independently of the others and that any concern over double damages would be handled by the court after trial. PLE presented a novation defense, which the jury rejected, finding in favor of ISG on the claims for breach of contract, fraudulent inducement, and fraudulent misrepresentation.[5] The jury awarded $450,000 to ISG in compensatory damages for PLE's breach of contract. On the fraudulent-inducement claim, the jury awarded $662,000 in compensatory damages against PLE and Bogue. The jury also awarded $600,000 in punitive damages against PLE and $900,000 against Bogue. For the fraudulent-misrepresentation claim, the jury awarded $80,699 in compensatory damages against both defendants. Further, it awarded $37,000 in punitive damages against PLE, and $148,000 against Bogue.

[¶19.] On April 18, 2017, the circuit court held a hearing on defendants' post-trial motions, including a motion for a new trial. PLE and Bogue argued that the jury based its verdict on "unsupported[,] unsubstantial testimony" that ISG's contract with the Department had been cancelled. The court denied the motion for new trial on the issue of liability finding Roman's testimonial evidence sufficient to prove causation. However, the Court granted a new trial on the issue of damages on all three counts, expressing concern that it could not replicate the jury's calculations.

---

5. "Novation is the substitution by contract of a new obligation for an existing one and is subject to the rules concerning contracts in general." SDCL 20-7-5.

[¶20.] The court noted that the Department had already paid ISG $366,490 as a down payment. Given that ISG paid PLE roughly $238,000, the court agreed with defendants' argument at the time of trial that ISG had "netted more than what defendants received from the plaintiff out of the contract situation." Additionally, although the court recognized how the jury arrived at its verdict on the contract damages, it was concerned the jury might have believed that ISG had to pay back the down payment even though no evidence was introduced at trial of any such obligation. The court determined that if the jury's award was based on an obligation to repay the down payment, such an award would have been speculative. The court concluded that "if the contract payments that ISG would have paid to PLE and the amount ISG received is reduced [to eliminate this potential double recovery], that brings the damage down to" $140,751 ($507,241 minus $366,490), which was "significantly less than the $450,000" the jury awarded.

[¶21.] As to the fraud claims, the court determined that "there are issues with the $112,463 that [ISG] claimed should be considered as damages." Specifically, the court observed there was "no showing by ISG . . . that they would have received that additional amount in the future" because it was "all historic payments" for projects predating the San Sebastian contract. Further, the court noted that $662,000 "far exceed[ed] . . . the $507,000.00 . . . amount of profit and the amount that ISG lost . . . ." The court stated that the jury could have awarded roughly $158,000 for the deposit ISG made to PLE, but it stated that it would then be inappropriate to also award contract damages. However, as to the $80,699 claim for fraudulent misrepresentation, the court stated that the amount "appear[ed] to

be supported by the evidence." Nevertheless, the court did not think that amount was "just and appropriate" and declined to order remittitur as an alternative to a new trial.

[¶22.] Finally, with respect to punitive damages, the court indicated that the verdict exceeded what the evidence supported on both the contract and fraud claims because the award was "tainted" by the unsubstantiated compensatory award. The court also questioned whether the jury intended to award punitive damages against both PLE and Bogue or whether they intended for ISG to recover from only one of the two. The court explained that since the jury had been instructed not to worry about double damages, it was unclear what the jury may have had in mind. The court observed, however, that neither party had objected to the verdict form.

[¶23.] ISG appeals from the court's grant of a new trial in favor of PLE and Bogue (collectively, Appellees), raising five issues, which we consolidate as follows:

> 1. Whether the circuit court erred in granting a new trial on compensatory damages for breach of contract.
>
> 2. Whether the circuit court erred in granting a new trial on compensatory damages on the fraud claims.
>
> 3. Whether the circuit court erred in granting a new trial on punitive damages on the fraud claims.

**Standard of Review**

[¶24.] "We review the grant of a new trial under the abuse of discretion standard . . . ." *Lewis v. Sanford Med. Ctr.*, 2013 S.D. 80, ¶ 15, 840 N.W.2d 662, 666. A court abuses its discretion when it makes "a fundamental error of judgment, a choice outside the reasonable range of permissible choices, a decision . . . [that], on full consideration, is arbitrary or unreasonable." *Wald, Inc. v. Stanley*, 2005 S.D.

112, ¶ 8, 706 N.W.2d 626, 629 (quoting *Arneson v. Arneson*, 2003 S.D.125, ¶ 14, 670 N.W.2d 904, 910). While we accord greater deference to a circuit court's decision to grant rather than deny a motion for a new trial, such "deference . . . is not without its limits[,]" and "[a circuit] court may only set aside a jury's verdict . . . 'if the jury's conclusion was unreasonable and a clear illustration of its failure to impartially apply "the reasoning faculty on the facts before them."'" *Lewis*, 2013 S.D. 80, ¶¶ 15–16, 840 N.W.2d at 666 (quoting *LDL Cattle Co., Inc. v. Guetter*, 1996 S.D. 22, ¶ 13, 544 N.W.2d 523, 527). We grant all inferences in favor of the nonmoving party, and "[i]f the jury's verdict 'can be explained with reference to the evidence,' it should be affirmed." *Id.* ¶ 16 (quoting *Reinfeld v. Hutcheson*, 2010 S.D. 42, ¶ 5, 783 N.W.2d 284, 287).

### Analysis and Decision

1. *Whether the circuit court erred in granting a new trial on compensatory damages for breach of contract.*

[¶25.]  ISG contends that the jury's award can be explained by the evidence because it accurately reflected the expected profit ISG lost due to the Department's cancellation of the contract minus costs and expenses ISG would have incurred in completing the contract. ISG argues its requested award of $507,240 represented its lost profits, namely: the $824,658.94 it would have received from the Department were the contract completed minus the $317,418 it would have paid PLE under the contract. ISG observes that the jury only awarded $450,000, which is less than the $507,240 it claims in lost profits. ISG also argues the jury could have resolved the circuit court's concern about the $366,490 received by ISG from the Department without speculating that ISG would have to repay it. ISG notes

that the *actual* payments ISG made to PLE and the expenses incurred in bringing Eagle Eye into compliance with the terms of the contract could have offset the $366,490 ISG received from the Department.

[¶26.]     SDCL 21-2-1 provides that "[f]or the breach of an obligation arising from contract, the measure of damages . . . is the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom." However, "[n]o damages can be recovered for a breach of contract which are not clearly ascertainable in both their nature and their origin." *Id.* SDCL 15-6-59(a) provides that a new trial may be granted as a result of "[e]xcessive or inadequate damages appearing to have been given under the influence of passion or prejudice" or due to "[i]nsufficiency of the evidence to justify the verdict[.]" "The amount of damages to be awarded is a factual issue to be determined by the trier of fact." *Estate of He Crow v. Jensen*, 494 N.W.2d 186, 192 (S.D. 1992). "Once the fact of damages has been established, uncertainty over the *amount* of damages is not fatal to recovery." *Bailey v. Duling*, 2013 S.D. 15, ¶ 35, 827 N.W.2d 351, 363 (emphasis added). Thus, "damages are speculative, not when the amount is uncertain, but when the *fact* of damages is uncertain." *Id.* (citing *Weekley v. Prostrollo*, 2010 S.D. 13, ¶ 24, 778 N.W.2d 823, 830) (emphasis added).

[¶27.]     In response to ISG's arguments, Appellees merely quote the circuit court, highlighting its statements that it carefully considered all the evidence and that it understood it could not order a new trial simply because it disagreed with the amount of damages. Appellees' primary argument is that the evidence was

insufficient in that no documentation was provided at trial proving the Department cancelled its contract with ISG.

[¶28.] Yet we have stated that "the amount of damages does not need to be proven with absolute exactness" and have affirmed an award's amount based solely on the testimony of a plaintiff. *Rumpza v. Zubke*, 2017 S.D. 49, ¶ 20, 900 N.W.2d 601, 608. Exhibit 76 establishes the existence of this contract and others between ISG and the Department. While ISG did not offer written evidence that the Department cancelled its contract with ISG, defendants cite no authority supporting its proposition that testimony alone cannot prove the fact of damages. The jury, as finder of fact, was free to believe Roman's testimony that the Department cancelled his contract, which in any event was inferentially supported by documentary evidence including the emails and contracts.

[¶29.] Moreover, the circuit court did not appear to take issue with the *fact* of damages. Indeed, the court observed that the defendants did not cross-examine Roman about the issue of documentation regarding the Department's payments and noted that "[t]he jury chose to believe [Roman's] oral testimony and the [c]ourt believes that is sufficient." Rather, it seemed concerned about the amount awarded. We have said that "in an action for breach of contract, the plaintiff is entitled to recover all his detriment proximately caused by the breach," and "[t]he ultimate goal in awarding damages for breach of contract is to 'place the injured party in the position he or she would have occupied if the contract had been performed.'" *Bad Wound v. Lakota Cmty. Homes, Inc.*, 1999 S.D. 165, ¶ 9, 603 N.W.2d 723, 725 (quoting *Ducheneaux v. Miller*, 488 N.W.2d 902, 915 (S.D. 1992)); *accord Lamar*

*Advert. of S. Dakota, Inc. v. Heavy Constructors, Inc.*, 2008 S.D. 10, ¶ 14, 745 N.W.2d 371, 376. Reasonable certainty in determining damages "'requires proof of a rational basis for measuring loss,' without requiring the trier of fact to speculate." *Kreisers Inc. v. First Dakota Title Ltd. P'ship*, 2014 S.D. 56, ¶ 40, 852 N.W.2d 413, 424 (quoting *Weekley v. Wagner*, 2012 S.D. 10, ¶ 13, 810 N.W.2d 340, 343).

[¶30.]     Here, ISG entered into evidence its contract with the Department for the TOPs, and the jury could determine the profit ISG expected to earn. Yet the circuit court questioned whether the jury mistakenly allowed ISG to recover its estimated profit, $507,240 (or $450,000, as awarded by the jury), in addition to the $366,490 down payment because it could have erroneously believed that ISG was required to return the down payment. In the court's view, the proper measure of damages would have been calculated by subtracting the claimed lost profits of $507,240 by the $366,490 down payment received from the Department for a total of $140,751. The court concluded that damages beyond this amount were excessive.

[¶31.]     However, ISG spent nearly the entire down payment on actual costs. ISG paid PLE $239,000 for two TOPs. In return, ISG received one nonconforming TOP, Eagle Eye, which required extensive repairs and alterations to conform to the contract's requirements. Although ISG did not produce documentation detailing the costs it incurred, ISG introduced Exhibit 32, an email chain between Bogue and Stubbe, as evidence that designing a replacement pod for Eagle Eye would cost $25,000 in addition to $98,500 in building expenses. The combined total of these costs and expenses alone ($239,000 in payments to PLE, $25,000 in design costs,

and $98,500 in construction costs) is $362,500—just shy of the down payment received by the Department. Based on the evidence presented at trial, the jury could have properly accounted for the partial payment of $366,490 because ISG expended this sum to deliver just one contractually compliant TOP to the Department.

[¶32.] Moreover, ISG still expected to receive another $458,168 ($824,658 minus the $366,490 down payment) from the Department. The jury awarded $450,000, the approximate amount ISG would have realized in profit but for Appellees' nonperformance.[6] Thus, after offsetting expected revenues by actual costs, the jury's award accurately "place[d] the injured party in the position [it] would have occupied if the contract had been performed." *Bad Wound*, 1999 S.D. 165, ¶ 9, 603 N.W.2d at 725. Therefore, the circuit court erred by ordering a new trial on the issue of compensatory damages on the breach-of-contract claim.

> 2. *Whether the circuit court erred in granting a new trial on compensatory damages on the fraud claims.*

[¶33.] ISG also argues the circuit court erred by ordering a new trial on the damages assessed for the fraud claims. The jury awarded compensatory damages of $662,000 on the fraudulent-inducement claim and $80,699 on the fraudulent-misrepresentation claim. ISG argues that the court erred by concluding that the

---

6. Had all the parties performed under the contract as expected, ISG would have paid PLE $317,418 for two conforming TOPs. Whether this amount is used to offset the $366,490 down payment or the subsequent $458,168 ISG would have received at the completion of the contract, ISG would have realized a profit of $507,240 minus any further costs (e.g., in delivering and setting up the PODs at the San Sebastian festival). Conversely, using the circuit court's calculations, which fail to consider actual costs, ISG would have realized a much smaller profit.

$662,000 compensatory award on the fraudulent-inducement claim exceeded ISG's losses. ISG argues that its damages under the fraudulent-inducement claim included the following: $507,240 in lost profits from ISG's contract with the Department; $112,465 in average annual income lost from other contracts computed from Exhibit 76; $25,000 spent to design a new pod for Eagle Eye; and $98,500 to manufacture Eagle Eye's replacement pod. ISG argues that these damages total $743,205 and that the jury weighed the evidence and awarded a lower amount. ISG also contends that although the circuit court acknowledged evidence supporting the $80,699 compensatory award on the fraudulent-misrepresentation claim, the court erroneously concluded that the award was inappropriate.

[¶34.]    SDCL 21-3-1 provides that "[f]or the breach of any obligation not arising from contract, the measure of damages . . . is the amount which will compensate for all the detriment proximately caused thereby, *whether it could have been anticipated or not*." (Emphasis added.) Further, "courts have some leeway in calculating damages and a lesser degree of certainty is required to prove tort damages as compared to contract damages." *Prostrollo*, 2010 S.D. 13, ¶ 24, 778 N.W.2d at 830. However, "facts must exist and be shown by the evidence which afford a basis for measuring the loss of the plaintiff with reasonable certainty." *Id.* ¶ 26.

[¶35.]    Here, the first portion of the damages instruction for fraud was the same as the breach-of-contract claim. Additionally, the jury was instructed that it could also award damages for "[a]ny other loss or damage you find [ISG] has proven because of the alleged fraudulent misrepresentation of Defendants." At the post-

-17-

trial motion hearing, the court took issue with the $112,463 figure cited by ISG during closing argument. The court agreed with Appellees that there was no showing that ISG would have continued to receive additional amounts from the Department in the future because Exhibit 76 only showed historic payments. The court also believed the $25,000 and $98,500 figures were speculative because ISG produced those numbers using an email sent by Stubbe to Bogue about the anticipated costs for upgrading Eagle Eye. Moreover, the court found "no indication in the record" whether ISG incurred those expenses when forced to upgrade Eagle Eye.

[¶36.] Exhibit 76 alone does not prove ISG would have received future contract payments from the Department. However, Roman testified that the incident effectively blacklisted ISG in Puerto Rico, among both governmental and private entities. He also testified that ISG lost all forty of its employees. The $112,466 amount—a figure ISG arrived at by subtracting the $366,490 deposit from the Department's total payment of $478,955.29 between September 2010 and July 2016—simply indicates the amounts ISG could have expected to earn had this transaction not destroyed its reputation. Additionally, Roman testified that ISG lost several lucrative contracts because of these events. To that end, ISG explained during closing argument that it had "lost a lot more" and that $112,466 was a low number given that ISG's "business ha[d] been destroyed" and that they were "not asking for all th[eir] damages here in this number." We have said that "[i]f some doubt persists on the certainty of damages, it is to be resolved against the breaching party: breaching parties cannot complain when the task of computing damages is

made more difficult by their own acts." *Prostrollo*, 2010 S.D. 13, ¶ 28, 778 N.W.2d at 831. And, as explained above, it was the jury's prerogative to believe Roman's testimony.

[¶37.] Similarly, doubts surrounding the $25,000 and $98,500 figures do not warrant a new trial. These figures stem from Exhibit 32, the Bogue–Stubbe email chain. The emails indicated that "the engineering cost for one pod" was $25,000 while the $98,500 in building expenses included $76,000 for the armor itself, $10,000 for the structure, and $12,500 "for NRE."[7] The court stated that there was no evidence ISG spent these amounts on correcting the problems with Eagle Eye and noted its concern about whether the $98,500 figure encompassed the $25,000 number. However, Roman testified that Eagle Eye did undergo both extensive repairs and upgrading. While it is unknown exactly how much these alterations cost, PLE's own estimations serve as evidence thereof.

[¶38.] With respect to the fraudulent-misrepresentation claim, the circuit court acknowledged that an award of $80,699 "would appear to be supported by the evidence." Nevertheless, the court expressed its concern that this amount was not "a just and appropriate verdict in this case." But, as the circuit court stated, the evidence supported the jury's award, which could be derived from the December 2013 payment ISG made to PLE at a time when PLE knew it could not perform the contract. The jury's verdict on the fraudulent-misrepresentation claim, having a sound basis in the evidence and not appearing unreasonable, is also affirmed. *See Lewis*, 2013 S.D. 80, ¶¶ 15–16, 840 N.W.2d at 666.

---

7.     The acronym "NRE" stands for non-recurring engineering fees.

3. *Whether the circuit court erred in granting a new trial on punitive damages on the fraud claims.*

[¶39.] In concluding that the issue of punitive damages[8] should be retried, the circuit court explained that the issues involved with the jury's compensatory damages awards "tainted" the punitive damages awards. The court also stated that it was unclear from the verdict form whether the jury intended for PLE and Bogue to separately pay the amounts listed next to their names.

[¶40.] However, as detailed above, the jury's compensatory damages awards can be explained by reference to the evidence without the need for impermissible speculation. This eliminates the concern that the punitive damages awards were tainted. As to the court's observation about potential jury confusion regarding the corporate and individual awards, the court informed the jury that it would make any necessary adjustments to the verdict to avoid a double recovery by ISG. Additionally, neither party objected to the verdict form, and defendants do not brief the issue except to make cursory references to the circuit court's reasoning. From our review of the record, there is sufficient evidence to support the punitive damages awards.

---

8. SDCL 21-3-2, which authorizes an award of punitive damages, provides:

> In any action for the breach of an obligation not arising from contract, where the defendant has been guilty of oppression, fraud, or malice, actual or presumed, or in any case of wrongful injury to animals, being subjects of property, committed intentionally or by willful and wanton misconduct, in disregard of humanity, the jury, in addition to the actual damage, may give damages for the sake of example, and by way of punishing the defendant.

## Conclusion

[¶41.]     The circuit court erred in concluding that there was insufficient evidence to support the compensatory awards. Because the compensatory damages awards provided by the jury can be explained by the evidence, they did not impermissibly taint the punitive-damages awards. The circuit court's order for a new trial on the issue of damages is reversed. On remand, in order to avoid a double recovery ISG must elect its remedy by choosing the contract damages, or the damages for fraudulent inducement or fraudulent misrepresentation. If ISG elects damages for one of the fraud claims it may recover the accompanying punitive damages against both PLE and Bogue because the awards were assessed separately against them.

[¶42.]     GILBERTSON, Chief Justice, ZINTER, Justice, RANK, Circuit Court Judge, and SEVERSON, Retired Justice, concur.

[¶43.]     RANK, Circuit Court Judge, sitting for JENSEN, Justice, disqualified.

[¶44.]     SALTER, Justice, not having been a member of the Court at the time this action was assigned to the Court, did not participate.